# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**S.E.S,** *as next friend and mother of minor,*
**J.M.S.**

    **Plaintiff,**

**v.**

**GALENA UNIFIED SCHOOL DISTRICT**
**No. 499,**

    **Defendant.**

**Case No. 18-2042-DDC**

## MEMORANDUM AND ORDER

   Plaintiff S.E.S. brings this action against defendant Galena Unified School District No. 499 on behalf of her minor son J.M.S., asserting sex or gender harassment violating Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"). Defendant has filed a Motion for Summary Judgment (Doc. 71). It contends the uncontroverted facts do not support J.M.S.'s Title IX claim that defendant discriminated against him because he did not conform to stereotypical expectations of masculinity. Doc. 72 at 1. Plaintiff has filed a Response in Opposition to defendant's motion (Doc. 75). And, defendant then filed a Reply Memorandum (Doc. 80).

   This matter also comes before the court on defendant's Motion to Strike Certain Declarations Submitted in Connection with Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 78). Defendant asks the court to strike two declarations submitted by plaintiff, arguing that plaintiff failed to identify them timely in her Rule 26 disclosures. Doc. 79 at 1. Plaintiff has filed a Memorandum in Opposition (Doc. 81) and defendant has filed a Reply (Doc. 82).

These matters thus are fully briefed, and the court is prepared to rule. Because the court considers the two declarations in the statement of facts and summary judgment analysis below, the court first addresses defendant's motion asking the court to strike the declarations. Then, the court addresses defendant's arguments for summary judgment. For reasons explained below, the court denies defendant's Motion to Strike Certain Declarations (Doc. 78) and the court denies defendant's Motion for Summary Judgment (Doc. 71).

## I.  Motion to Strike

Defendant moves to strike the declarations of two individuals—S.D.K. and A.R.D.— submitted by plaintiff with her Response to defendant's summary judgment motion. Doc. 78. Defendant argues the court should exclude S.D.K. and A.R.D.'s declarations because these individuals were not identified timely as witnesses in plaintiff's Rule 26 disclosures or supplements. Doc. 79 at 1.

Under the Initial Order Regarding Planning and Scheduling, the parties' initial Rule 26(a) disclosures were due September 10, 2018. Doc. 20 at 2. And, under the Scheduling Order, the court ordered the parties to serve all supplemental disclosures no later than "40 days before completion of all discovery." Doc. 28 at 3. Any "supplemental disclosures served 40 days before the deadline for completion of all discovery must identify all witnesses and exhibits that probably or even might be used at trial." *Id.*

Plaintiff did not disclose S.D.K. or A.R.D. in her September 10, 2018 initial Rule 26(a) disclosures. Plaintiff also did not identify them in her June 3, 2019 supplemental Rule 26(a) disclosures.[1] On June 10, 2019, plaintiff emailed defendant providing the two declarations and noting that plaintiff would "at some early point supplement [her] disclosures [of] these two

---

[1]     Forty days before the close of discovery—*i.e.*, the deadline for supplemental disclosures—was May 22, 2019.

witnesses." Doc. 79-3 at 2. Plaintiff supplemented her Rule 26 disclosures for a second time on June 28, 2019. This second supplemental disclosure—made the last business day before the close of discovery—identified S.D.K. and A.R.D. But, plaintiff did not provide any address or telephone number for these witnesses in her disclosure.[2] Doc. 79-4 at 2. However, the declarations provided to defendant on June 10, 2019 did provide addresses for S.D.K. and A.R.D. Doc. 75-2; Doc. 75-3. Discovery closed on July 1, 2019. Doc. 28 at 4.

Plaintiff now uses the two declarations to oppose defendant's motion for summary judgment. Defendant argues the court should strike these declarations under Fed. R. Civ. P. 37(c)(1) and Fed. R. Civ. P. 26(e). The intent of the disclosure deadlines is to place the "opposing party and counsel . . . in a realistic position to make judgments about whether to take a particular deposition or pursue follow up 'written' discovery before the time allowed for discovery expires." Doc. 28 at 3. Indeed, the Scheduling Order warned: "[s]hould anything be included in the final disclosures under Fed. R. Civ. P. 26(a)(3) that has not previously appeared in the initial Rule 26(a)(1) disclosures or a timely Rule 26(e) supplement thereto, the witness or exhibit probably will be excluded from offering any testimony under Fed. R. Civ. P. 37(c)(1)." *Id.* at 3–4.

Under Fed. R. Civ. P. 26(e)(1)(A), parties are required to supplement or correct their disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

---

[2]    Fed. R. Civ. P. 26(a)(1)(A)(i) directs that a party must provide to the other parties, as part of its initial disclosures and "without awaiting a discovery request . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information . . . ."

Plaintiff contends her disclosure provided a phone number for S.D.K. Doc. 81 at 2. But, the court does not find any indication of a phone number included in the redacted disclosures provided with defendant's motion to strike. *See* Doc. 79-4.

Fed. R. Civ. P. 37(c)(1) provides that a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."

Defendant contends that plaintiff's disclosures were untimely, and the court should preclude plaintiff from using the declarations as evidence. Plaintiff provided the declarations less than a month before discovery closed and after the scheduled deadline for supplemental disclosures. And, plaintiff formally disclosed the individuals as witnesses on the last business day before discovery closed. So, defendant argues, it was denied "an opportunity to discover information about these witnesses' testimony, including taking their deposition[s], if necessary." Doc. 79 at 5.

Plaintiff concedes that her disclosures failed to comply with the deadlines provided in the Scheduling Order. And plaintiff does not give a justification for the delay. But, plaintiff argues the late disclosures were harmless, and thus the court should allow plaintiff to use the declarations to oppose defendant's summary judgment motion.

"The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (internal quotation marks and citation omitted). And, the court "need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *Id.* But, when determining whether to allow evidence violating Rule 26(a),

> the court should consider the following factors: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.

*Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (internal quotation marks and citation omitted).

Defendant cited these factors in its brief, but didn't analyze them. The court now turns to that task, analyzing the four factors and finding they favor allowing plaintiff to use the evidence to oppose summary judgment. While plaintiff inexplicably failed to abide by the court's deadlines for the Rule 26(a) disclosures and supplements, the court is persuaded that the failure was harmless.

*First*, the court finds that defendant has sustained little prejudice or surprise from the late disclosure. Though defendant contends it did not have ample opportunity to discover information about or depose S.D.K. and A.R.D, defendant received the declarations along with notice that plaintiff planned to supplement plaintiff's disclosures three weeks before discovery closed. *See Esparza v. Regent Ins. Co.*, No. 17-1163-JTM-KGG, 2019 WL 3006436, at *2 (D. Kan. July 10, 2019) (explaining disclosure of a witness's identity and contact information "promptly and in writing . . . is all that Rules 26(a) and 26(e) require[]" and plaintiff was not required to supplement its disclosure under Rule 26(e) where the information was otherwise made known to the other party during discovery). The declarations included the subjects of information from S.D.K. and A.R.D. that plaintiff would use to support plaintiff's claim, along with their names and addresses. Defendant never asserts that it took any action to conduct written discovery or schedule a deposition with S.K.D. or A.R.D. before discovery closed. Nor does defendant assert that it tried to work with plaintiff's counsel about extending the discovery deadline to conduct the needed discovery. And defendant never sought permission—from plaintiff or the court—to depose these witnesses after discovery closed.

The parties also participated in a final pretrial conference with Magistrate Judge Mitchell on July 26, 2019.  Doc. 66.  From the Pretrial Order, it does not appear defendant raised any objections to plaintiff's last-minute Rule 26(e) supplemental disclosures during that conference. *See* Doc. 67.[3]  Instead, defendant filed the motion to strike presently before the court after plaintiff responded to defendant's summary judgment motion.  The dispositive motion deadline was set for August 16, 2019, which the court later extended to September 13, 2019 at defendant's request.  Doc. 70.  Defendant easily could have requested an opportunity to depose these witnesses before the deadline to file its summary judgment motion.  It never did.  In short, while plaintiff made the disclosures past the deadline in the Scheduling Order, the court finds that this tardiness did not inflict sufficient prejudice or surprise meriting exclusion of the witnesses.

*Second*, defendant could have cured any prejudice before the dispositive motion deadline and it still could cure any prejudice before trial.  Defendant hasn't tried to cure its purported prejudice.

*Third*, introducing such testimony would not disrupt the trial.  Indeed, almost two months remain before the trial will begin on May 5, 2020.  Ample time remains for defendant to seek to leave from plaintiff or the court to conduct additional discovery out of time to discover information from S.D.K. or A.R.D.

*Finally*, the court does not find evidence of bad faith or willfulness by plaintiff.  Plaintiff does not provide an excuse for the delayed disclosure of these witnesses.  But, plaintiff did provide the declarations to defendant within days after the witnesses signed their declarations.

---

[3]  In the Pretrial Order, the parties preserved their rights to object to the evidence's admissibility at trial, but stipulated to the foundation and authenticity of documents produced in discovery for purposes of summary judgment motions and trial.  Doc. 67 at 5.

Thus, the court concludes that all four *Jacobsen* factors favor a finding that plaintiff's late disclosures were harmless. The court will allow plaintiff to use the two declarations as evidence to oppose defendant's summary judgment motion and the court denies defendant's Motion to Strike Certain Declarations (Doc. 78).

## II.      Hearsay and Personal Knowledge Objections

Defendant objects to certain evidence submitted by plaintiff to oppose its summary judgment motion, arguing plaintiff has failed to establish personal knowledge for such evidence or arguing that it is excludable as hearsay. The court addresses three of defendant's particular objections here, explaining the reasons it overrules defendant's objections. In the summary judgment facts below, the court refers back to the analysis here when ruling other objections.

*First,* defendant objects to testimony from student S.D.K. Student S.D.K. explained that "a number of boys started making fun of [J.M.S.] because of the way he wore his hair and the clothes he wore, and they called that gay; they called him gay, fag, and faggot and ma[d]e fun of him for the way he looked." Doc. 75-2 at 1. Defendant argues this portion of the declaration "fails to establish that the witness[] [has] personal knowledge with regard to the reasons why [J.M.S.] was allegedly called these names." Doc. 80 at 31–32.

A "nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Under Fed. R. Evid. 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." The proponent of the evidence bears the burden to establish personal knowledge but "[t]his standard is not difficult to meet." *United States v.*

*Gutierrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014). "A court should exclude testimony for lack of personal knowledge only if in the proper exercise of the court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *Id.* (internal citations and quotation marks omitted); *see also Silas v. Target Corp.*, 569 F. App'x 405, 407 (6th Cir. 2014) (explaining that "testimony should not be excluded for lack of personal knowledge unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about" (internal quotation marks, citations, and alterations omitted)).

Under Fed. R. Evid. 701, a witness may testify in the form of an opinion if the testimony is "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue[.]" *See also* Fed. R. Evid. 701 advisory committee's note to 2011 amendments (explaining that the term "opinion" is broad and also covers a lay witness's inferences); *PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1181 (D. Kan. 2001) (explaining personal knowledge includes inferences and opinions if those inferences and opinions are "grounded in observation or other first-hand personal experience," and are not "speculations, hunches, intuitions, or rumors" (internal citation omitted)). In discrimination cases, lay opinion testimony generally is admissible so long as the person testifying observed the facts that formed the basis of the opinion or inference. *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1179–80 (10th Cir. 2001). "Courts have often permitted lay witnesses to express opinions about the motivation or intent of a particular person if the witness has an adequate opportunity to observe the underlying circumstances." *Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1465–67 (5th Cir. 1989) (collecting cases) (concluding trial court did not abuse discretion in admitting witness's

testimony that "he believed [plaintiff] was terminated" because of his age where testimony was based on the witness's experience and familiarity with the company's "hiring policy and general corporate youth movement," despite the witness having "no first-hand knowledge of the circumstances leading to [plaintiff's] termination"); *cf. United States v. Hoffner*, 777 F.2d 1423, 1245–46 (10th Cir. 1985) (explaining "courts have been very liberal in admitting witnesses' testimony [about] another's state of mind if the witness has had sufficient opportunity to observe the accused so as to draw a rational conclusion about the intent of the accused").

Here, a rational juror could find S.D.K. possesses personal knowledge of the testimony in his declaration. S.D.K.'s declaration establishes that S.D.K. was in the same grade as J.M.S., they were on the football team together, and they had at least one class together. Viewing S.D.K.'s statement in this context, one fairly could infer S.D.K. was present when the described events took place and this suffices to support a finding of personal knowledge. While S.D.K. does not say he was one of the students using these names and thus cannot say with 100% certainty that the names were used "*because* of the way [J.M.S.] wore his hair and the clothes he wore," Doc. 75-2 at 1 (emphasis added), the context of S.D.K.'s statement shows he was in a position to observe the conduct and form an opinion or draw an inference why other students called J.M.S. those names. Indeed, a reasonable inference from his declaration is that he observed other students call "that gay" and intended it about the "way J.M.S. wore his hair and the clothes he wore." *Id.* And, S.D.K. testifies, other students made fun of J.M.S. "for the way he looked." From such first-hand observations, plaintiff has established by a preponderance of the evidence S.D.K. had personal knowledge to provide an opinion about the reasons why the students called J.M.S. those names. The court overrules defendant's objection.

*Second,* defendant objects to testimony from student A.R.D.  A.R.D. declared that when J.M.S. got a haircut that fall, "a number of boys started making fun of [J.M.S.] because of the haircut and calling him names. . . .  They called [J.M.S.] gay, fag, and faggot and made fun of him for the way he looked."  Doc. 75-3 at 1.  Again, defendant argues this portion of the declaration "fails to establish that the witness[] [has] personal knowledge with regard to the reasons why [J.M.S.] was allegedly called these names."  Doc. 80 at 31–32.  The court overrules this objection as well, for the same reasons explained above for S.D.K.'s testimony.  From the context of her declaration, a rational juror could find A.R.D. possesses personal knowledge here sufficient to provide an opinion about why the other students called J.M.S. those names.  A.R.D.'s declaration indicates she was in the same grade as J.M.S., had a class with him, and that the comments were made around school, including at lunch and in the hallways.  A reasonable inference favors the conclusion that she was present when the name-calling took place and observed the other students making fun of J.M.S. for the way he looked.  This qualifies as the personal knowledge required to opine under Rule 701 that the other students made the comments because of his haircut and appearance.  And, a reasonable inference from her declaration is that she perceived the name-calling started when J.M.S. got a distinctive haircut.

*Third,* defendant objects to testimony from student G.P.  G.P. described how "a number of boys in the seventh grade called [J.M.S.] names, mostly gay, fag or faggot, both to his face and out of his presence."  Doc. 75-4 at 1.  And G.P., though he was an eighth grader, admitted he "was one of the boys who sometimes called him such names and for that [he] later apologized to J.M.S. . . . ." *Id.*  G.P. also explained that the seventh-grade boys "said they called [J.M.S.] names because he 'looked f[a]g,' 'dressed fag,' or had a 'fag haircut.'"  *Id.*

Defendant objects to this evidence from G.P.'s declaration for two reasons. Doc. 80 at 32. First, defendant argues that plaintiff has not established that the witness had personal knowledge about the reasons J.M.S. was called these names because G.P. uses phrases like "they said they called him names because . . . ." The court overrules this objection, for the same reasons explained above for S.D.K.'s testimony. A rational juror could find G.P. possesses personal knowledge sufficient to give a lay opinion of the reasons why other students called J.M.S. names. G.P. was on the middle school football team with J.M.S. and it's reasonable to infer that he personally observed the name-calling and could surmise why the students were using those names. Thus G.P. may rationally opine about the motivation underlying the name-calling after perceiving the events. And, while the declaration uses "they said," G.P. freely admits that he was one of the boys calling J.M.S. such names and so, a rational juror could infer G.P.'s statement to mean he name-called for the same reasons.

Next, defendant objects to G.P.'s testimony "about what the other students told him" because "it is inadmissible hearsay if offered to prove the truth of the matter." Doc. 80 at 32. After careful consideration, the court overrules this objection. On summary judgment, evidence does not need to be submitted in a form that would be admissible at trial, but the content or substance of such evidence must be admissible. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). "Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form." *Id.*

Under Fed. R. Evid. 801 and 802, out-of-court statements offered to prove the truth of the matter asserted in the out-of-court statement are hearsay and are inadmissible, unless the statements qualify for an exception to the rule against hearsay. Here, plaintiff offers G.P.'s

statement about what the other students said—"they said they called him names because he 'looked f[a]g,' 'dressed fag,' or had a 'fag haircut'"—to prove the other students called J.M.S. names because of the way he looked. So, the out-of-court declarants' statements are offered to prove the truth of the matter asserted in one sense—*i.e*, that the declarants said what G.P. asserts they said. But, they are not offered to prove that J.M.S. actually "looked fag," "dressed fag," or "had a fag haircut." Instead, they are offered to prove that the motivation behind the name-calling was designed to harass J.M.S. because he was different from the other male students. For this reason, the statements that otherwise would be inadmissible hearsay meet the exception to the rule against hearsay found in Fed. R. Evid. 803(3).

Fed. R. Evid. 803(3) provides an out-of-court statement offered to prove the truth of the matter asserted is not excluded by the rule against hearsay where it is "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily heath), but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Here, it appears G.P.'s statement is offered to show the declarants' (the seventh-grade students') state of mind—*i.e.*, their motive—behind the name calling. And, to the extent this motive includes a statement of their belief—that J.M.S. "looked fag," "dressed fag," or "had a fag haircut"—the statements are not offered to prove the "fact" asserted. Instead, the statements are offered to show the students' state of mind—*i.e.*, that the name calling was done with an underlying animus toward J.M.S. based on his failure to conform to male stereotypes. *See* 30B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Evidence* § 6833 (2018 ed.) ("The most significant statements admitted under Rule 803(3) arise in a subset of cases where the motive for action is disputed . . . . In these circumstances, evidence of the [declarant's] state of mind becomes

tactically important and legally relevant. Out-of-court statements of a then-existing state of mind can be critical to the fact finder seeking to understand the [declarant's] motivation for acting in a certain manner."); *see also Powell v. Laborers Union No. 1271*, 426 F. App'x 615, 621 (10th Cir. 2011) (explaining a hearsay problem exists only "if the comments were offered for the truth of the matter asserted therein" but if the racial comments are "relevant for the racial attitudes they revealed" they are "not hearsay"); *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1249–50 (6th Cir. 1995) ("The disparaging and racist comments allegedly made by [the supervisors] were not offered to prove the truth of the statements but to demonstrate the racial attitudes of [the supervisors]. . . . Even if . . . the racial slurs were hearsay, they would be admissible under the hearsay exception for statements of the declarant's then existing state of mind."), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671, 693–94 (6th Cir. 1979) (explaining officers' testimony about the reasons for the police department's practices "as related to them by their former police supervisors" should not have been excluded as hearsay because the "evidence of discriminatory purpose" was admissible under the Rule 803(3) exception to the hearsay rule), *overruled on other grounds by Mich. Rd. Builders Ass'n, Inc. v. Millikin*, 834 F.2d 583 (6th Cir. 1987); *Roberts v. Henderson*, No. CIV 98-1315 MV/LFG, 1999 WL 35808245, at *4 (D.N.M. Dec. 15, 1999) ("[D]iscriminatory or harassing statements are not hearsay when they are not offered to prove the truth of the matter asserted. Often such statements are offered to prove that the statements were made as evidence of discriminatory animus." (citations omitted)); *cf. McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1143–44, 1143 n.13 (10th Cir. 2006) (explaining Rule 803(3) "does not permit the witness to relate any of the declarant's statements as to why [the declarant] held the particular state of mind, or what [the declarant] might have believed would

have induced the state of mind" unless those statements are "not offered to prove the fact remembered or believed" and are offered for another relevant purpose (internal quotation marks and citation omitted)); *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1264–66 (7th Cir. 1993) (explaining statement that otherwise would be hearsay could be used to show the declarant's discriminatory animus or intent, if otherwise relevant to plaintiff's claim). The court thus overrules defendant's objection.

The court next summarizes the summary judgment facts, which include the testimony from S.D.K., A.R.D., and G.P. discussed here. Where defendant has made similar objections to other facts included in the summary judgment record, the court refers back to the analysis applied here.

### III.    Summary Judgment Facts

The following facts are either stipulated by the parties in the Pretrial Order (Doc. 67), uncontroverted, or, where genuinely controverted, are viewed in the light most favorable to plaintiff—the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378–80 (2007). Even though the court views the facts in the light most favorable to plaintiff, it ignores improper inferences and arguments made in the statement of facts sections and responses to those sections within the parties' briefs. *See Leathers v. Leathers*, No. 08-1213-MLB, 2012 WL 5936281, at *2 (D. Kan. Nov. 27, 2012) ("Statements of uncontroverted facts and responses thereto shall cite *only* facts. Argument and the drawing of inferences shall be reserved for the authorities and argument section . . . .").[4] The court also does not consider factual assertions made in a response

---

[4]    Defendant objects to many of plaintiff's responses to defendant's statements of fact, as well as plaintiff's statements of fact, because they include argument by counsel. For a blatant example of including argument of counsel, *see, e.g.*, Doc. 75 at 105 (Pl.'s Statement of Uncontroverted Facts ¶ 125), which is set up as an argument that defendant was deliberately indifferent—an element of plaintiff's claim—and contains citations only to earlier-included facts: "First, the District demonstrated deliberate indifference because . . . ." The court ignores improper argument of counsel included in these fact sections.

to proposed statements of fact that fail to comply with the court's rules.  *See* D. Kan. Rule 56.1(b)(2) (requiring a party opposing summary judgment who "relies on any facts not contained in a movant's memorandum" to "set forth each additional fact in a separately numbered paragraph, supported by references to the record" in the same manner as the concise statement of material facts required to be provided by the movant).[5]  And, the court generally considers only evidence readily identifiable by reference to affidavits, deposition, transcripts, or specific exhibits.  Where the parties have failed to include references to the record in their statements of fact, the court does "not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury."  *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (internal quotation marks and citations omitted).

### *The Parties*

Defendant is a unified school district and governmental subdivision of the State of Kansas.  Doc. 67 at 2.  Defendant is governed by a Board of Education.  The Board of Education appoints a superintendent who "has charge and control of the public schools of the school district, subject to the orders, rules, and regulations of the board of education."  Doc. 75 at 10.

---

[5]  Defendant objects to many of plaintiff's responses to its statements of fact, arguing that plaintiff's attempts to add and clarify facts by including additional evidence after already admitting the fact is uncontroverted is improper and should be disregarded.  The court agrees and generally disregards additional facts that were not included in either defendant's statements of fact or plaintiff's own statements of fact.  However, in compiling the factual history below, the court has referred to portions of the record cited by the parties to support their factual contentions and, at times, quotes or summarizes directly from the record in lieu of reciting the facts as paraphrased by the parties.

Plaintiff's own statements of fact also ignores D. Kan. Rule 56.1(b)(2)'s requirement to "set forth each additional fact in a separately numbered paragraph."  Defendant objects to many of plaintiff's asserted facts for this reason.  Indeed, in many of the additional 194 numbered paragraphs, plaintiff lumps multiple facts together into one numbered paragraph.  Plaintiff's facts also repeat many of defendant's facts and even repeat some of plaintiff's own earlier-stated facts in an attempt to re-categorize those facts within each element of plaintiff's claim.  The court reminds plaintiff that this rule exists so that the parties and the court can determine the facts efficiently to decide summary judgment motions promptly.  Plaintiff's method contravenes the court's rules and materially complicated the court's work.

Defendant receives federal funds. Doc. 67 at 4. Galena Middle School is part of the school district and consists of sixth, seventh, and eighth grades.

J.M.S. is a minor male born in November 2002. Doc. 72-15 at 3. J.M.S. started attending schools in defendant's district in the second grade. Doc. 72-15 at 25. He attended Galena Middle School from 2014 to 2017. Doc. 67 at 5. During the 2015-2016 school year, J.M.S. was in seventh grade. This was the year that other students began harassing J.M.S., as explained in more detail below. S.E.S. is J.M.S.'s mother. K.D.S. is J.M.S.'s father. J.M.S. has a younger brother, G.L.S.

The facts below involve a number of defendant's employees. The following bullet items identify those employees whose testimony is used to support the parties' arguments and their respective employment positions with defendant when the alleged events occurred:

- Brian Smith ("Superintendent Smith") was the superintendent of the district between 2014 and 2017.

- Toby VanCleave ("Principal VanCleave") was the middle school/high school principal during the 2014-2015 and 2015-2016 school years.

- Mike Strickland ("Assistant Principal Strickland") was the assistant principal at Galena Middle School during the 2014-2015 and 2015-2016 school years. He was the school administrator typically in charge of discipline.

- Lisa Klaver ("Principal Klaver") was the primary school principal when J.M.S. was in seventh grade. She became the middle school principal during the 2016-2017 school year when J.M.S. was in eighth grade.

- Kellen Ryan ("Coach Ryan") was the high school business finance and computer applications teacher between 2011 and 2016. He was J.M.S.'s football coach during his seventh grade year.

- Diana Moss was J.M.S.'s seventh grade social studies teacher.

- Caleb Williamson ("Assistant Coach Williamson") was the assistant middle school football coach during J.M.S.'s seventh grade year.

- Tamara Ballentyne was J.M.S.'s eighth grade math teacher and seminar/study hall teacher.

- Kalyn Thompson ("Coach Thompson") was J.M.S.'s seventh and eighth grade golf coach.[6]

- Andrea Dinkel was J.M.S.'s music teacher from sixth to eighth grades.

- Jodi Russell was J.M.S.'s science teacher for seventh and eighth grades.

### *Alleged Harassment Events and Reporting of Harassment*

Beginning in seventh grade, J.M.S. was the recipient of unwelcome comments and other acts by other students at Galena Middle School. As explained in detail below, the alleged gender-based harassment consisted of comments about J.M.S.'s hair and style, unwanted physical contact, and various forms of name-calling such as "gay," "Locker Room," "queer," "bitch," "fag," and "faggot." The incidents summarized below led J.M.S. to leave Galena Middle School in 2017, during the spring of his eighth grade year. He transferred to a school in Joplin, Missouri.

---

[6] Coach Thompson was employed by the district as a coach, but the employer for her special education position is Southeast Kansas Interlocal 637. Doc. 80-3 at 3.

**Seventh Grade**

J.M.S. testified that he is always shy and waits for others to talk to him, rather than initiating conversations. In seventh grade, J.M.S. started fixing his hair and dressing more nicely. That is when other students started harassing him with comments and other acts. He believes his hair and the way he dressed were "some of the reasons" why the other students were making fun of him. Doc. 72-15 at 4. He also believes they made fun of him because he was never rude to people and, when no one else was, he was nice to girls. S.E.S. heard some of J.M.S.'s friends make fun of his hair by saying "nice haircut." She also heard them make fun of the way he dressed multiple times. Comments were not just made about J.M.S.'s hair or the way he dressed. J.M.S. testified that students also called him gay and hit him for no reason. J.M.S. testified that he is not gay. *Id.* at 3.

Student S.D.K. explained that "a number of boys started making fun of [J.M.S.] because of the way he wore his hair and the clothes he wore, and they called that gay; they called him gay, fag, and faggot and ma[d]e fun of him for the way he looked."[7] Doc. 75-2 at 1. Similarly, student A.R.D. declared that when J.M.S. got a haircut that fall, "a number of boys started making fun of [J.M.S.] because of the haircut and calling him names. . . . They called [J.M.S.] gay, fag, and faggot and made fun of him for the way he looked."[8] Doc. 75-3 at 1. G.P. described how "a number of boys in the seventh grade called [J.M.S.] names, mostly gay, fag or

---

[7]     Defendant objects to this evidence because plaintiff didn't disclose the witness in a timely fashion. Doc. 80 at 31–32. As explained above in Part I, the court denies defendant's motion to strike S.D.K.'s declaration for this reason. Defendant also argues this portion of the declaration "fails to establish that the witness[] [has] personal knowledge with regard to the reasons why [J.M.S.] was allegedly called these names." *Id.* The court overrules this objection for reasons explained above in Part II.

[8]     Defendant objects to this evidence because plaintiff didn't disclose the witness in a timely fashion. Doc. 80 at 31–32. As explained above in Part I, the court denies defendant's motion to strike A.R.D.'s declaration. Defendant also argues this portion of the declaration "fails to establish that the witness[] [has] personal knowledge with regard to the reasons why [J.M.S.] was allegedly called these names." *Id.* The court overrules this objection as well, for the same reasons explained above in Part II.

faggot, both to his face and out of his presence." Doc. 75-4 at 1. And G.P., though he was an eighth grader, admitted he "was one of the boys who sometimes called him such names and for that [he] later apologized to J.M.S. . . . ." *Id.* G.P. also explained that the seventh-grade boys "said they called [J.M.S.] names because he 'looked f[a]g,' 'dressed fag,' or had a 'fag haircut.'"[9] *Id.*

Members of the faculty noticed J.M.S.'s hair and style. Andrea Dinkel remembered J.M.S. as polite, a good dresser, neatly groomed, with a nice haircut. Doc. 75-21 at 2. Coach Thompson recalled J.M.S. as a good dresser, neat, hair was cut, and stylish. Doc. 72-7 at 8. Jodi Russell described J.M.S. as very well dressed, kept his hair cut, was not slovenly; a very sweet kid, very respectful, very polite. Doc. 75-22 at 6. Tamara Ballentyne testified that she believes J.M.S. was bullied, in part, because he dressed well and styled his hair. She also testified that he may have been targeted because he was a newer student in the district and the other students may have thought that J.M.S. was trying to act better than the other students. She believed that some of the students thought their actions were joking or teasing, but that she didn't think J.M.S. took them as joking. Tamara Ballentyne stated that J.M.S. did not fit in with the student culture at Galena Middle School.

During a football game on September 24, 2015, a player on J.M.S.'s own team, E.D., hit him in the head with a football. J.M.S. was wearing a helmet at the time. E.D. was bouncing a football off of J.M.S.'s head while on the sidelines. And, S.E.S. observed that when J.M.S. would move to get away from E.D., E.D. followed him and kept bouncing the football off of his

---

[9]     Defendant objects to this evidence from G.P.'s declaration for two reasons. Doc. 80 at 32. First, defendant argues that plaintiff has not established that the witness had personal knowledge about the reasons J.M.S. was called these names because G.P. uses phrases like "they said they called him names because . . . ." Second, defendant objects to G.P.'s testimony "about what the other students told him" because "it is inadmissible hearsay if offered to prove the truth of the matter." Doc. 80 at 32. The court overrules these objections, for the reasons stated above in Part II.

helmet. J.M.S. didn't know why E.D. hit him in the head with the ball, but "thought it was just someone messing around." Doc. 72-15 at 6. E.D. and J.M.S. were not friends or part of the same social group. J.M.S. reported this incident to his mother, but not to any of the coaches. S.E.S. messaged Beau Sarwinski, the athletic director, and Coach Ryan about this incident, but did not hear anything in response to this message. S.E.S. also approached Coach Ryan and spoke to him about the incident.[10]

During this same football season, students began calling J.M.S. "Locker Room," based on a rumor that J.M.S. only wanted to play football so he could see boys undressed or in their underwear.[11] J.M.S. first was told that student J.O. had started the nickname. When J.M.S. asked J.O., J.O. told him it was E.D. who had started the nickname. E.D. denied starting the "Locker Room" nickname and rumor.

J.M.S. identified five particular students who used the "Locker Room" nickname—A.S., D.H., K.C., J.O. and E.D.[12] J.M.S. also identified A.S. as the student who started the rumor that

---

[10]    Coach Ryan claims he was not aware of this football bouncing incident. Doc. 72-11 at 3. But, the court views the facts in the light most favorable to plaintiff at this stage. And, as explained below, it appears Coach Ryan punished E.D. for this incident, supporting an inference he was alerted to it.

[11]    Defendant again objects to S.E.S. and G.P.'s testimony about this nickname as inadmissible hearsay if offered to prove the truth of the matter asserted. Doc. 80 at 33–34. Defendant also objects to S.D.K. and A.R.D.'s declarations about this nickname based on failure to establish personal knowledge why J.M.S. was called this name. *Id.* at 34. The court notes, first, that J.M.S. also testified about the meaning of the nickname "Locker Room" in a similar manner to these witnesses, and defendant included this in its own statements of fact. *See* Doc. 72 at 15. And, the court overrules these objections for the same reasons explained above in Part II. A reasonable inference from S.D.K. and A.R.D.'s declarations is that they observed students making the "Locker Room" comments and thus provide sufficient perception for a rationally based Rule 701 opinion about the reasons behind the nickname. S.D.K. was on the football team with J.M.S. and stated that the nickname started during football season. Doc. 75-2 at 1. A.R.D.'s declaration recites that even as a girl and thus "not around when it started[,] many of us asked the boys about it." Doc. 75-3 at 1. To the extent S.E.S., G.P., S.D.K. or A.R.D.'s statements include out-of-court statements about what others said the "Locker Room" nickname meant, those statements are not offered to prove the truth of the matter asserted—*i.e.*, that J.M.S. was only playing football to see boys undressed in the locker room. Instead, they are offered to provide the motive behind the name-calling and give context to why "Locker Room" is alleged as a form of harassment based on sex.

[12]    Minor Male Number 2 also called J.M.S. "Locker Room." The parties' briefs indicate they agree that Minor Male Number 2 is E.O. *See* Doc. 80 at 33 (defendant does not controvert plaintiff's fact ¶ 12). But, the cited testimony does not establish the identity of Minor Male Number 2.

he was gay. This nickname was used at school and during sporting events. J.M.S. reported the "Locker Room" comments to S.E.S. on September 28, 2015. S.E.S. then met with Coach Ryan about the comments.

S.E.S. testified that Coach Ryan told her he would take care of it. J.M.S. also talked with Coach Ryan before practice one day and asked him if he could stop the conduct "because nothing was changing." Doc. 72-15 at 5. J.M.S. also raised the conduct with Assistant Coach Williamson. Assistant Coach Williamson and Coach Ryan never personally heard J.M.S. being called "Locker Room." Coach Ryan testified that J.M.S. never reported the "Locker Room" nickname to him, but that J.M.S. did tell him the name calling he endured was offensive. Doc. 72-11 at 6 ("He didn't tell me the specifics of the names, just told me they were calling him names and it was offensive. Again, I don't recall the specifics of the names.").

S.E.S. also made Coach Ryan aware that three male students—who were also members of the football team—were calling J.M.S. names in Diana Moss's classroom. The names referenced homosexuality. Coach Ryan then met with the three minor male students—D.H., S.N. and E.D.—first as a group and then individually. The three students told Coach Ryan that they were all joking around as a group, including J.M.S., and calling each other names. But, when they called J.M.S. a name, he got offended and told the teacher. In the individual meetings, Coach Ryan learned more. S.N. told Coach Ryan he was good friends with J.M.S. and thought the comments were just joking around as friends. D.H. told Coach Ryan that he called everyone names. Coach Ryan couldn't recall exactly what E.D. said but it was along the lines of they were "a group of guys that were giving each other a hard time and didn't think that it was anything offensive," just joking among friends. Doc. 72-11 at 5. When J.M.S. talked to Coach Ryan, however, J.M.S. told Coach Ryan the comments were offensive to him. Coach Ryan told

D.H., S.N. and E.D to be careful what they say because what they think is joking may be offensive to others. And, the students told him it would not be an issue again. After Coach Ryan met with the three male students, S.E.S. sent him a text message thanking him for his help. Coach Ryan testified that he brought the incidents involving J.M.S. in Diana Moss's classroom to Assistant Principal Strickland's attention.

Assistant Principal Strickland remembers Coach Ryan bringing an "issue with football" to his attention and that "there was an incident brought to [him] about the locker room."[13] Doc. 72-10 at 4. Assistant Principal Strickland couldn't remember exactly what the incident involved, but testified that he assumed it involved J.M.S. being called names. Doc. 72-10 at 4–5. He didn't remember if the name-calling involved accusations that J.M.S. was gay or homosexual, but it might have. Assistant Principal Strickland knows that, at some point, "there was something being said that [J.M.S.] was gay." *Id.* at 5. Assistant Principal Strickland and Coach Ryan spoke with some students on the football team about the matter, including E.D. Assistant Principal Strickland also spoke with male students J.O., E.O., and A.S. *Id.* at 6. Assistant Principal Strickland also reported the incident to Beau Sarwinski, the athletic director, and "probably" reported it to Principal VanCleave "at some point." Doc. 72-10 at 5. He believed that after he spoke with these boys, the situation was resolved. Assistant Principal Strickland testified that J.M.S. was polite, kind and a "typical" middle schooler. Doc. 72-10 at 9. He saw J.M.S. being friendly with and sitting at the same lunch table as some of the same students who called him names. *Id.*

---

[13] It is unclear from the record what incident Assistant Principal Strickland is testifying about in the evidence cited by the parties. *See* Doc. 72-10 at 4–6. For example, it could be the incident where E.D. bounced the football off of J.M.S.'s head, it could be the "Locker Room" comments or rumor that J.M.S. was gay, it could be the name-calling by football players in Diana Moss's class. The questions posed referred to the football bouncing incident, name-calling accusations, a "locker room incident," and so forth. When asked if the nickname "Locker Room" was reported to him, Assistant Principal Strickland stated "That was never reported to—that part was never reported to me. I think that was." Doc. 72-10 at 5.

On October 2, 2015, S.E.S. raised the rumors of J.M.S. being gay and being called "Locker Room" with Ken Cook, a teacher, and Assistant Coach Williamson at a varsity football game. Assistant Coach Williamson told S.E.S. and Ken Cook that he would address the issue and he reported the discussion to Coach Ryan. A few days later, Coach Ryan talked to the football team. J.M.S. testified that Coach Ryan "said we all need to be a family and stop treating each other like we're not." Doc. 72-15 at 7. Coach Ryan also held E.D. after practice. The same day, E.D. told J.M.S. and S.E.S. that Coach Ryan told him hitting J.M.S. in the head with a football was not sportsmanlike and he had to run as a punishment. And, E.D. apologized to J.M.S. Assistant Coach Williamson testified that Coach Ryan talked with E.D. about name calling.[14]

But, the harassing comments to J.M.S. did not stop after Coach Ryan talked to the team. Doc. 72-15 at 7. J.M.S. testified that students continued to call him "Locker Room" through at least December 2015. *Id.* (explaining the nickname lasted into basketball season, which began in December). S.D.K. testified the name was used "pretty much all year long." Doc. 75-2 at 2. Students A.R.D., G.P., and K.I. also stated the "Locker Room" nickname was used at times throughout the entire seventh grade school year. Doc. 75-3 at 2; Doc. 75-4 at 2; Doc. 75-5 at 2. K.I. even heard "Locker Room" used in eighth grade. Doc. 75-5 at 2.

After football season ended and basketball season began, the rumor about J.M.S. being gay continued. Multiple students called J.M.S. "queer," "fag," and "faggot" and made gay jokes at J.M.S.'s expense. Doc. 72-15 at 8. J.M.S. testified that these students—including D.O., M., D.H., E.O., A.S., L., G.P., K.C. and C.A., among others—called him these names because of the way he dressed, fixed his hair, and how he treated people. *Id.* J.M.S. reported these harassing

---

[14] Assistant Coach Williamson testified he was "not sure" whether he was present when this meeting occurred, but he recalled Coach Ryan addressing something with E.D. about name calling. Doc. 72-12 at 4.

comments to S.E.S. at least six or seven times between October 2015 and the end of the fall semester. Doc. 72-8 at 8. S.E.S. did not talk to any teachers or administrators of the school district when J.M.S. first told her about these comments. But, J.M.S. himself reported the behavior to teachers Tamara Ballentyne, Rayanna Lee, and Diana Moss. Doc. 72-15 at 8.

J.M.S. told Tamara Ballentyne during football season or early in the basketball season that "people were saying mean things to [him] constantly." Doc. 72-15 at 8. He didn't relay any specific comments, only that mean things were being said. His conversations with Rayanna Lee were similar—he told her that people were being mean but did not give more details. *Id.* J.M.S. identified one student—A.S.—to Tamara Ballentyne as one of the people making the comments. Ultimately, J.M.S. estimates he talked to Tamara Ballentyne "five or more times" and Rayanna Lee "[f]our times, maybe." *Id.* at 9. J.M.S. did not ask Tamara Ballentyne or Rayanna Lee to do anything about the comments. J.M.S. did not expect Rayanna Lee to do anything about the comments.[15]

J.M.S. also told Diana Moss that students were being mean to him.[16] Diana Moss testified that J.M.S. told her one time that kids were mean to him in her classroom. Doc. 72-5 at 7. She explained that J.M.S. told her some students had called him a "loser." She did not consider the "loser" comment to be a form of bullying. Diana Moss did not recall J.M.S. telling her that he was being called "fag," "faggot," "gay," or "homo." But, she did testify that J.M.S. told her boys were calling him "Locker Room." *Id.* Diana Moss did not think J.M.S. told her

<hr/>

[15] Though not cited properly in the parties' summary judgment facts, J.M.S. testified that he "believe[d] [Tamara Ballentyne] said she'd talk to some kids" and he "wanted her to [do something about it] but was too shy to say it." Doc. 72-15 at 8; *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.")

[16] As explained in more detail below, J.M.S. testified that he told Diana Moss "[t]hat people were being mean to [him] and [he] didn't know why, getting hit in the head, and then [he] told her about someone sticking their hands down their pants and then putting it on [his] face." Doc. 72-15 at 9.

which kids were picking on him. After the first time when J.M.S. told Diana Moss that some kids were picking on him,[17] she moved his desk right next to hers "so [she] could be more in tune with what was occurring." Doc. 72-5 at 5.

In Diana Moss's seventh grade seminar class, a student—G.P.—walked behind J.M.S. and hit him on the head 15 or 20 times. He also called J.M.S. names like "faggot," "queer," and "gay" six to 10 of these times.[18] S.D.K., A.R.D., and K.I. were in the class and observed this behavior. Doc. 75-2 at 2 (S.D.K. described that G.P. often came into the seminar class to visit and he almost always called J.M.S. a name like "fag" or "faggot," sometimes lightly flicking J.M.S.'s head as well.); Doc. 75-3 at 2 (A.R.D. described how G.P. came "to visit Ms. Moss almost every day," usually called J.M.S. "fag" or "faggot," as he walked by his desk, and many times "would tap [J.M.S.] on the shoulder or brush his hand across J.M.S.'s head.); Doc. 75-5 at 1–2 (K.I. explained that G.P. came into their seminar at least twice a week to visit and K.I. heard G.P. call J.M.S. "gay or fag or faggot about 20-30 times, and on some of those occasions . . .

---

[17]     It is not clear from the record when during J.M.S.'s seventh grade year this move took place. *See* Doc. 72-5 at 6 (Diana Moss testified that she does not remember if this happened before or after the holidays.).

[18]     Plaintiff's statement of fact references an event when G.P. was in Diana Moss's classroom that occurred in the fall semester. Doc. 75 at 68. But, plaintiff provides no citation to the record for this fact and J.M.S. testified he believes this took place in the second semester. *See* Doc. 72-15 at 9.

Testimony conflicts over how many times J.M.S. was hit in the head. J.M.S. initially testified that G.P. had hit him in the back of the head once and didn't say something each time he walked by. Doc. 72-15 at 10. But, J.M.S. later testified that G.P. walked by and hit him on the head 15 or 20 times, making offensive comments some of those times. *Id.* at 33. It is not clear from the deposition testimony how many days these interactions between G.P. and J.M.S. occurred. *See* Doc. 72-15 at 34 (J.M.S. testified that he was confused about what constituted "continually" and explained that "it was one day and then it happened multiple times," and then went on to state that all of the instances happened over one or two days, but G.P. has "done it several times" and J.M.S. believes on more than one day.). G.P. does not remember flicking J.M.S. as he walked by, but admits he "probably called him names a few times" and that flicking J.M.S. with his hand "is the kind of dumb middle school thing I might have done." Doc. 75-4 at 2. The court views the evidence, of course, in the light most favorable to plaintiff as the non-movant. So, the court accepts J.M.S.'s version of the events.

The parties' briefs also swapped assertions about the number of times J.M.S. said he was hit and the number of times he said G.P. called J.M.S. names. But, the court reviewed J.M.S.'s deposition testimony and the accurate testimony is reflected above.

flicked or lightly slapped [J.M.S.] in the head.").[19]  G.P.'s comments were made loudly enough

for others to hear them, including Diana Moss.  *See* Doc. 75-2 at 2 (S.D.K. explained that he

could hear the comments and he was seated farther from Diana Moss than J.M.S.); Doc. 75-3 at

2 (A.R.D. noted that G.P. called J.M.S. names "in a normal voice" and, even though A.R.D.'s

desk was not close to J.M.S.'s desk, she could hear the comments.); Doc. 75-5 at 1–2 (K.I.

testified that G.P.'s comments were loud "enough for everyone in the class to hear.").  S.D.K.

explained that G.P. was one of Diana Moss's favorite students, but J.M.S. was not.[20]  Doc. 75-2

at 2.

J.M.S. did not know why G.P. hit him in the head.  He reported G.P.'s actions to Diana

Moss.  Doc. 72-15 at 10, 33.  And, he asked her to tell the principal.  But, to J.M.S.'s knowledge

she did not do anything.  Doc. 72-15 at 10.

At one point during seventh grade year, G.P. said "Hey, fucking fag" to J.M.S. during

Diana Moss's class.  The comment was made loud enough for others to hear.  But, when J.M.S.

asked Diana Moss if she had heard G.P.'s comment, she said she did not hear it.  Doc. 72-15 at

10; *see also* Doc. 75-2  at 2 (S.D.K. remembers once J.M.S. "turned to Ms. Moss and either said

something or made a questioning gesture and Ms. Moss said something such as 'I didn't see

anything.'"); Doc. 75-3 at 2 (A.R.D. stated that Ms. Moss never did anything to stop [G.P.] from

. . . calling names."); Doc. 75-5 at 2 (K.I. observed J.M.S. complain to Ms. Moss and "[h]er

---

[19]     As explained above in Part I, the court denies defendant's Motion to Strike S.D.K. and A.R.D.'s
declarations.  Defendant also objects to plaintiff's use of K.I.'s testimony because plaintiff failed to include a
citation to the record with its statement of fact.  Generally, the court will not search the record where, as here, the
party asserting the fact has failed to include a reference to evidence in the record.  *Gross*, 53 F.3d at 1546.  But,
plaintiff did attach K.I.'s declaration to its Response and the court did come across the evidentiary support for this
fact in its review, and thus will consider it.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited
materials, but it may consider other materials in the record.").

[20]     Defendant objects to this testimony, asserting a lack of personal knowledge.  The court overrules
defendant's objection.  S.D.K.'s declaration recites that he observed Diana Moss's treatment of different students
and recites sufficient personal knowledge and a rational basis for this lay opinion testimony.  *See* Fed. R. Evid. 701.

response was that she didn't see it."). J.M.S. also asked Diana Moss if she would tell someone about the incident, but she never did. J.M.S. told his mom about this incident, but did not raise it with anyone else in the district besides Diana Moss. G.P. didn't come back to Diana Moss's classroom much after this particular incident and the behavior stopped after this incident.[21]

On January 5, 2016, J.M.S. attended a varsity basketball game against Baxter Springs High School. He sat with a girlfriend—A.T., a Baxter Springs student—on the Baxter Springs side to avoid any confrontations. Doc. 72-15 at 10; Doc. 75-12 at 3. Two male Galena students—E.O. and J.O.—came over and started trouble. J.O. sat on A.T.'s lap, with E.O. instigating the conduct. J.O. asked A.T. "why she was dating [J.M.S.] because [he] was so gay." Doc. 72-15 at 11. J.M.S. asked them to leave. They left, but then returned "further embarrassing J.M.S. to the point of J.M.S. asking his mother to come get him." Doc. 75-12 at 3. J.M.S. texted S.E.S. about the conduct, but did not tell any adults associated with the district at the game. No adults were present to hear the conduct either. Student D.H. also was around at the time of J.O. and E.O.'s behavior towards J.M.S.

At school next morning, January 6, 2016, E.O. said to J.M.S. that "Mr. Steal your girl is here" upon J.O.'s arrival.[22] Doc. 72-15 at 11. He also texted the same comment to J.M.S. J.M.S. testified E.O. did this "[b]ecause he thought it would be funny to provoke [J.M.S.]." *Id.* At this point, J.M.S. texted his parents that he was so tired of everyone at the school. J.M.S. testified that he did not expect the district to stop E.O. from sending him a text message.

---

[21]     Diana Moss testified that she does not recall G.P. calling J.M.S. names or slapping J.M.S. across the head in her classroom. She testified that both before and after J.M.S. moved his desk she did not see any of the described incidents in her classroom. On summary judgment, the court views the evidence in the light most favorable to plaintiff, as non-movant. So, the court accepts J.M.S.'s and the other student's testimony about what happened in Ms. Moss's classroom.

[22]     The "Mr. Steal your girl" comment appears to refer to J.O. or E.O. having flirted with J.M.S.'s girlfriend the night before at the basketball game.

At lunch that day, E.O. asked J.M.S. "how it felt to have him take his girl the night before." Doc. 75-12 at 4. J.M.S. then punched E.O. in the face. E.O. asked J.M.S. to leave him alone and continued to eat his lunch. J.M.S. felt like the incident at lunch when he talked to and hit E.O. wasn't enough, so he "went back for a second time." Doc. 72-15 at 12. Later that afternoon at basketball practice, J.M.S. got in E.O.'s face and yelled at him about the text, asking him to fight. E.O. said no and began crying, saying J.M.S. was bullying him. One of E.O.'s friends—K.W.—stepped in "and tried to push [J.M.S.] like back off the bleachers, so [J.M.S.] choked him out." *Id.* The elementary school principal, Susan New, came in and broke up the fight. Doc. 72-8 at 9. J.M.S. testified the whole team was around during this incident at practice, and he believes Coach Ryan, Jacoby Martin, Beau Sarwinski, and Principal VanCleave were present as well. Doc. 72-15 at 12.

After this fight, S.E.S. came to the school to meet with Assistant Principal Strickland, Principal VanCleave, and J.M.S. S.E.S. described how, at this meeting, J.M.S. had reported the history of issues with the other students, including the incident at the basketball game the night before, students calling him "Locker Room" and other names, and that he's "taken all this from all these people all year." Doc. 72-8 at 9–10. S.E.S. testified that she informed Assistant Principal Strickland and Principal VanCleave about the issues with G.P. in Diana Moss's classroom during this meeting as well.[23] Doc. 72-8 at 8. Assistant Principal Strickland told

---

[23] Defendant argues this assertion is not supported by the citation to the record, which begins with J.M.S. reporting "it" to Diana Moss. But, the court is able to determine by reviewing the testimony leading to the cited exchange that "it" meant the "incidents in Ms. Moss's class." While the leading exchange was not cited in the briefing, the transcripts attached to defendant's briefs provide the requisite context. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Assistant Principal Strickland, however, testified that he did not remember discussing events in Diana Moss's classroom at this meeting. Doc. 72-10 at 7 (testifying that if name-calling in Diana Moss's classroom and her lack of response was discussed "Mr. Van Cleave would have handled that, that was a teacher issue" but Assistant Principal Strickland did not "remember that specifically being said"). The court views the evidence in the

J.M.S. to come directly to him with any future issues and he would keep an eye on it. *Id.* at 10. Until this January 2016 meeting, S.E.S. had not made any reports to the district about J.M.S. since her meeting with Coach Ryan in October 2015.

J.M.S. was suspended for his actions. S.E.S. wanted the kids who had been harassing and bullying J.M.S. to be punished as well. S.E.S. testified that in the meeting she "went over everything [J.M.S. has] been through and [she] said, Maybe he's tired of it." Doc. 72-8 at 9. But, S.E.S. stated that Principal VanCleave "did not want to hear why it happened." *Id.* And, she says Principal VanCleave told her he felt K.W. "was protecting E.O. from an aggressor." *Id.* J.O. alerted J.M.S.'s girlfriend about the fight at practice, and she broke up with him. Other students reported to J.M.S. that K.W. "returned to basketball laughing about J.M.S. being suspended while he . . . was not being punished." Doc. 75-12 at 4.

After J.M.S. returned from his suspension, Assistant Principal Strickland "continued to check on [J.M.S.]." Doc. 72-8 at 10. Yet, the harassment continued. On January 11, 2016, someone called J.M.S. "fag" at lunch. Then, someone said "Oh, don't say that, he'll go tell his momma." Doc. 72-8 at 11. J.M.S. stated that he doesn't remember this incident or who made the "fag" comment. Doc. 72-15 at 12. And, he testified, he doesn't believe he reported this incident to any school officials when it happened. But, he reported it to his mom. And, at some point that day, Assistant Principal Strickland became aware students were continuing to harass J.M.S. because the same day, S.E.S., K.D.S., and J.M.S. had a meeting with Assistant Principal Strickland, Principal VanCleave, and Superintendent Smith.[24] Doc. 72-15 at 12; Doc. 72-8 at 11.

---

light most favorable to plaintiff, as non-movant. So, the court accepts S.E.S.'s testimony about what she told Assistant Principal Strickland and Principal VanCleave at this meeting.

[24]      S.E.S. testified that J.M.S. went to Assistant Principal Strickland's office after this incident, and told Assistant Principal Strickland that he didn't want to go to school there anymore. Doc. 72-8 at 11.

S.E.S. explained that K.D.S.—J.M.S.'s father— headed up to the school "because he'd just had it, you know. Over and over and over, and here we were just back and at it again." Doc. 72-8 at 11. S.E.S. later joined her husband at the school. Assistant Principal Strickland recalls a meeting with J.M.S., his parents, and Principal VanCleave after J.M.S. was upset about being called gay or fag and called his mom about wanting to leave school. Doc. 72-10 at 7.

During this meeting, J.M.S. described the basketball game incident, the locker room comments, and all the various incidents of harassment "back to when it started." Doc. 72-15 at 13; *see also* Doc. 72-8 at 12 (S.E.S. testified they discussed "everything back to the beginning of the school year, the locker room, Diana Moss, the everyday comments of fag, faggot, gay, . . . the Baxter Springs basketball game situation, [and] the fight."). Assistant Principal Strickland remembers there were discussions about name calling. Doc. 72-10 at 7. He also believes the prior "situation in the locker room" was discussed. *Id.* at 8. And he thinks he informed S.E.S. and K.D.S. that he had handled that situation with Coach Ryan and Principal VanCleave.

At the meeting, Superintendent Smith explained that other students may be picking on J.M.S. out of jealously because J.M.S. was "always dressed nice and, you know, he looked like he had some money," while other students in the district were from a poorer "social economic standpoint." Doc. 72-4 at 6–7. J.M.S. testified that Superintendent Smith said he thought J.M.S. was getting bullied because he "looked nice" or "dressed nice" and had "people who care about him." Doc. 72-15 at 12. S.E.S. testified that Superintendent Smith described J.M.S. as "a target" explaining to her that (as S.E.S. remembers the conversation):

> He's got nice clothes, he doesn't dress like the other kids, you know, he dresses nice with his nice shirts and his dress shorts, because he always wore khaki shorts and polo shirts whereas the other kids always wore athletic clothes, and J.M.S., he's trendy. He's got a nice haircut, you know, he likes to play guitar, he's just different than the other kids, he's polite. It's going to make him a target.

Doc. 72-8 at 12.[25]  After this conversation, S.E.S. believed that J.M.S. was being called names because he didn't dress or act like the other boys.  She testified that:

> [T]hose other kids, they're men because they dress like men, they're wearing their Nike and Adidas and Under Armour every day and [J.M.S.]'s not . . .  all they talk about was going to the NFL and going to pro sports and [J.M.S.] talks about how [he's] going to the military so [he] can be a doctor, so he wasn't man enough and that's why he's a fag. . . .  And so he plays guitar and he does this and he's got this nice hair and he dresses different than all of them, and so it clicked [for me] . . . he's a target because of his nice hair and his nice clothes and he plays guitar and he's artistic and he's different and he's sensitive . . . .

Doc. 72-8 at 12.

This meeting was the first time Superintendent Smith was aware J.M.S. was having problems at school.  S.E.S.'s answer to defendant's interrogatories states, "We were told they had been documenting everything in J.M.S.'s file and were watching, waiting, they could see on cameras, the teachers were aware and they were going to make sure everything was handled properly."[26]  Doc. 75-12 at 4.  After this January 2016 meeting, the plan was for J.M.S. to continue going to Assistant Principal Strickland with any issues "but anything that happened further would be reported to [Superintendent] Smith and he would handle it himself."  Doc. 72-8 at 13; *see also* Doc. 72-10 at 8 (Assistant Principal Strickland testified that after a meeting where

---

[25]     Defendant objected to plaintiff's proposed statement of fact "characteriz[ing] Superintendent Smith's response" and plaintiff's "attempt[] to attribute Superintendent Smith's alleged comments to an inquiry about a specific quoted question by S.E.S."  Doc. 80 at 41.  Defendant contends plaintiff's "attempt to quote a statement allegedly made by Superintendent Smith through the testimony of S.E.S. [is] inadmissible hearsay when offered to prove the truth of the matter."  *Id.* at 42.  The court has summarized S.E.S.'s deposition testimony, above.  To the extent S.E.S.'s recollection of Superintendent Smith's statements at this meeting differs from Superintendent Smith's recollection of his statements, S.E.S.'s testimony offers the statements as one by an opposing party.  Fed. R. Evid. 801(d)(2)(D).  This rule designates the statement as non-hearsay.

[26]     Generally, the court will not search the record where, like here, the party asserting the fact has failed to include a reference to evidence in the record.  *Gross*, 53 F.3d at 1546.  But the court did come across evidentiary support for this quoted statement in its review, and thus will consider it.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

     S.E.S. also testified that since this meeting occurred, she has seen J.M.S.'s record, and the only thing noted was the emails from Assistant Principal Strickland and Superintendent Smith detailed below.  Doc. 75-10 at 22.

Superintendent Smith was present "every situation that involved [J.M.S.] was supposed to be reported directly to [Superintendent Smith].").  Superintendent Smith is "pretty sure" he told Principal VanCleave and Assistant Principal Strickland to investigate the situation further and remembers receiving a verbal report some time later from Assistant Principal Strickland.  Doc. 72-4 at 6.  Assistant Principal Strickland had described to Superintendent Smith that some of the kids J.M.S. was having issues with were the same people who J.M.S. was friends with and sat with at lunch.  *Id.*  And, Superintendent Smith "thought everything was fixed" after he followed up with J.M.S. and S.E.S. and did not hear any other problems reported.  Doc. 72-4 at 7.

During a home basketball game on February 4, 2016, a minor male—G.F.— told a minor female—L.M.—that J.M.S. was "the biggest fag in the world."  Doc. 72-15 at 13.  G.F. later texted L.M. the same comment.  J.M.S. didn't hear this comment in person, but L.M. told him about it toward the end of the game when everyone was leaving.  J.M.S. didn't report this conduct to any adult associated with the district while at the game.  But later, he told S.E.S. what happened.  S.E.S. asked if J.M.S. had reported the issue to Assistant Principal Strickland.  But, J.M.S. said Assistant Principal Strickland had already left the game when he was told about the comment.  This was the first issue J.M.S. raised with S.E.S. since the January 11, 2016 meeting.  J.M.S. testified that kids at school used the word "fag" a lot towards him.

That night, J.M.S. messaged G.F. asking him why he made the comment.  G.F. mocked and called J.M.S. gay a couple more times.  Doc. 75-12 at 5.  Ultimately, the boys' parents got involved and resolved the issue.  G.F.'s dad was angry and took away his phone.  And, S.E.S. felt like the conversations among the parents had resolved the problem.  Doc. 72-8 at 13.

J.M.S. doesn't recall if he personally ever brought this conduct to the attention of anyone employed by the district.  But, the next day, S.E.S. called Assistant Principal Strickland and

reported the incident.  She made Assistant Principal Strickland aware of the situation, but she also advised him that matter had been resolved through direct conversations with G.F. and his family.

A few days later, on February 8, 2016, Assistant Principal Strickland sent an email to J.M.S.'s teachers,[27] copying Principal VanCleave and Superintendent Smith.  Doc. 72-17 at 1. This email explained "We have had some issues with [J.M.S.] being bullied" and asked the teachers report to the office immediately any bullying or other issues they saw.  *Id.* Superintendent Smith sent a follow up email to the group:  "I would also like to add that if you hear a student call another student any names like queer or fag that you immediately send them to the office.  This is unacceptable behavior.  It is harassment, and it will not be tolerated."  *Id.* at 2.

On April 19, 2016, a minor male—M.—was calling J.M.S. "fag" on the bus on the way home from golf practice.  J.M.S. asked M. to stop and told M. that he would punch him once they got off the bus if M. didn't stop.  J.M.S. did not report the conduct to the coaches on the bus.  But, J.M.S. texted S.E.S. about what was happening, and she drove to meet the bus at the school.  S.E.S. also texted Coach Thompson while on her way to the school, letting her know there was an issue between M. and J.M.S.  This was the first time J.M.S. had raised an issue with S.E.S. since the February 8, 2016 email.

When S.E.S. arrived at the school before the bus, she asked the softball coach, Jacoby Martin, to contact the Athletic Director Beau Sarwinski and Superintendent Brian Smith, but Jacoby Martin told her he didn't have their phone numbers.

---

[27]     The email was addressed to Diana Moss, Jodi Russell, Rayanna Lee, Andrea Dinkel, Mary Williams, Sally Cook, and Ross Bailey.  Doc. 72-17 at 1.  Jodi Russell remembers receiving the email.  Diana Moss does not.  Doc. 75-23 at 2.

When the bus arrived at the school, S.E.S. went to talk to Coach Thompson. J.M.S. and M. got into a physical altercation when the students were putting their clubs away and no coaches were around. J.M.S. pushed M. into a wall. M. then spit on J.M.S., and J.M.S. slammed M. against the wall again. M.'s mom was at the school as well. S.E.S. testified that J.M.S. told her "that M.'s mom said What's this all about? And J.M.S. said Your son keeps calling me a fag, and M.'s mom said You know we've talked about all that name calling." Doc. 72-8. S.E.S. was not present at the time, but learned about this incident through J.M.S. *Id.* at 8–9.

J.M.S. reported this incident to Coach Thompson. S.E.S. also talked with Coach Thompson about the incident and Coach Thompson told S.E.S. she would handle it. Doc. 72-8 at 15.

Coach Thompson testified that two or three students notified her that something had happened between J.M.S. and M. Doc. 72-7 at 3. The students said J.M.S. and M. were "arguing and . . . nitpicking at each other" but Coach Thompson didn't remember if any physical contact was involved. *Id.* Coach Thompson then talked to J.M.S. and M. together about the incident. Coach Thompson kept J.M.S. and M. in separate groups during golf practice to avoid any problems between them. She never heard M. call students "gay" or "fag." After this April 19, 2016 incident, M.'s mom informed Coach Thompson that M. was going to quit golf because of his grades.

The next day after the bus/physical altercation between M. and J.M.S., S.E.S. contacted Assistant Principal Strickland. J.M.S. testified that his mom reported the incident to Superintendent Smith as well. Assistant Principal Strickland called M. and J.M.S. into his office. He discussed the name calling and the physical altercation. He told the boys that the name calling was not worth getting suspended over but the pushing and shoving could be considered

fighting and they could get suspension for it. He asked each boy if they wanted the other person suspended, and each agreed they did not want any suspensions. After the meeting, Assistant Principal Strickland reported to S.E.S. what had happened at the meeting. And, S.E.S. was satisfied with the response. Doc. 72-8 at 15. J.M.S. doesn't believe he had any additional problems with M. after this date.

In May 2016, during seminar class, a minor male—D.O.—put his hands down his pants, rubbed his privates, and then put his hands on J.M.S.'s face. Defendant considered this incident to be sexual in nature. J.M.S. doesn't know why D.O. did this, but thought D.O. probably did it to be funny. J.M.S. reported this to Diana Moss. He also reported the incident to S.E.S. S.E.S. then went to the school to talk to Assistant Principal Strickland about the incident. D.O. was given a one-and-one-half day in-school suspension. Another district employee emailed Superintendent Smith about this incident. The email recited that Assistant Principal Strickland had "asked that [the employee] text [Superintendent Smith] about this situation" and went on to describe the event. Doc. 75-14. S.E.S. was satisfied with how Assistant Principal Strickland handled the situation.

Towards the end of seventh grade, S.E.S. observed that J.M.S. began crying and becoming more emotional. Doc. 75-10 at 9. The next time S.E.S. would report conduct about J.M.S. to the school would be October 2016, during J.M.S.'s eighth grade year. J.M.S.'s peers continued to call him names during the summer. These comments were not reported to the school district. S.E.S. did contact the kids' parents. The parents "came down hard on the kids and it would knock off for a little bit and then pick right back up." Doc. 72-8 at 16. S.E.S. agreed that the district can't control students outside of school or police them on social media. *Id.* at 17.

**Eighth Grade**

Students continued to call J.M.S. names during eighth grade. S.D.K., A.R.D., and K.I. explained the name calling continued throughout the entire seventh and eighth grade school years. Doc. 75-2 at 2–3 (S.D.K. explained in eighth grade J.M.S. was "still called names often . . . mostly gay, fag or faggot . . . ."); 75-3 at 2; Doc. 75-4 at 2 (A.R.D. stated the name calling "went on all through Eighth Grade, until J.M.S. left school."); Doc. 75-5 at 3 ("During both seventh and eighth grades [K.I.] frequently heard boys call J.M.S. names . . . usually gay or fag" and K.I recalled hearing J.M.S. "called such names at least once or twice a day, all year, both years.").

At some point during eighth grade, J.M.S. had a conflict with student K.M. in band class. The exact details of this incident were not included in the summary judgment record briefing. S.E.S. tried to handle the situation with K.M.'s parent, but notified Principal Klaver and sent her a screenshot of S.E.S.'s communications with the other parent. At S.E.S.'s request, Principal Klaver did not conduct an investigation into this incident. And, Principal Klaver testified, "There was never another conflict with [K.M.] the rest of the school year while [J.M.S.] was attending." Doc. 72-3 at 4.

On October 10, 2016, J.M.S.'s girlfriend—N.G.—posted a picture of J.M.S. on social media. Minor male G.P. commented on the post calling J.M.S. "so fucking gay." Doc. 72-15 at 17. S.E.S. saw the post and told J.M.S. to block G.P. on social media and to avoid the situation. N.G. ended up taking down the picture to avoid the negative comments. J.M.S. believed G.P. made the comment to "fit in with everyone else." *Id.* at 18. Neither J.M.S. nor S.E.S. brought this incident to the attention of anyone with the school district. S.E.S. testified she did not bring this to the district's attention because it happened around 9:00 p.m. and outside of school. She

also didn't talk to G.P.'s parents about the issue because G.P.'s home life was not good and there were no parents to talk to. J.M.S. also testified that he did not expect the school district to prevent someone from making a comment on social media. After this incident, J.M.S. did not have any other problems with G.P. and, in April 2017, G.P. apologized for making the comment.

Throughout this fall semester, both male and female students continued to cause "drama," though J.M.S. does not have dates recorded for every incident. Doc. 75-12 at 7. "Drama" included people referring to J.M.S. as "gay, fag, faggot, bitch, and those kinds of things." Doc. 72-15 at 32. It would happen "anytime J.M.S. would be happy or seem to have anything good going for him." Doc. 75-12 at 7.

On October 20, 2016, J.M.S. commented to some of the boys at school that a new girl was cute. This comment was passed along to J.M.S.'s girlfriend—N.G.— who then broke up with J.M.S. But, they later worked out their problems. On this same date, October 20, minor male D.H. yelled at J.M.S. and S.E.S. about J.M.S.'s comments about the new girl while they were in their car after basketball practice. S.E.S. explained that D.H. took issue with J.M.S. calling another girl cute, and believed that his girlfriend should know. Doc. 72-8 at 18. S.E.S. felt D.H.'s behavior was inappropriate and disrespectful. S.E.S. testified that J.M.S.'s comment was innocent, but the students used it "to stir up more harassment of him, just to get his girlfriend to break up with him." *Id.* J.M.S. did not expect the district to do anything about D.H.'s actions and he "just blew it off." Doc. 72-15 at 19. J.M.S. did not report this to the school district. But, S.E.S. did. S.E.S. called Principal Klaver about the incident. She also contacted D.H.'s mother, a second grade teacher.

On November 23, 2016, J.M.S. had another incident involving D.H. D.H. pushed J.M.S. into a girl during physical education class, causing J.M.S. accidently to touch the girl's rear end.

D.H. then told N.G that J.M.S. was playing "grab ass" with another girl in class.  And, N.G.

again broke up with J.M.S.  J.M.S. believes that Mr. Dawes, the physical education coach,

witnessed this pushing incident.

In late November and early December, minor female T.B. was told by minor female N.G.

and a couple of N.G.'s friends that T.B. should not go to the upcoming dance with J.M.S.  They

sent T.B. messages describing J.M.S. as a "fuck boy" and "probably gay," telling her she should

not go to the dance with J.M.S.  Doc. 72-8 at 19.  J.M.S. showed S.E.S. the messages.  S.E.S. and

T.B.'s mom also discussed the grief T.B. was getting for agreeing to go to the dance with J.M.S.

J.M.S. doesn't believe this incident ever was reported to the school.  Doc. 72-15 at 20.  But,

S.E.S. says she reported this to Principal Klaver.  Doc. 72-8 at 20.

On December 6, 2016, minor female R.M. tagged J.M.S. in a picture in a group chat that

said something along the lines of "we all have that one friend that's gay but says he's not[.]"

Doc. 72-15 at 26.  J.M.S. notified S.E.S., but did not report it to anyone at school.  He testified he

did not expect the district to stop the message from being sent.  Doc. 72-15 at 20.[28]  S.E.S.

contacted R.M.'s mother and the families, who were friends, worked through this situation.

R.M. was grounded by her parents.  S.E.S. also notified Principal Klaver about this incident.

S.E.S. let Principal Kalver know she already had spoken to R.M.'s mom and didn't want

Principal Klaver to "handle it," but she wanted Principal Klaver to note it on the record.  Doc.

72-8 at 20.  Principal Klaver testified that she did not look into the social media post because

S.E.S. told her that R.M.'s mom was contacted and R.M. had been grounded.  She stated that "it

---

[28]     J.M.S.'s testimony indicates the message was sent while the students were at school.  Doc. 72-15 at 20.
J.M.S. also testified, "I couldn't expect them to make them not send it, but I expected them to make them not send
any more or handle it from there."  *Id.*

was resolved between the parents." Doc. 72-3 at 10. J.M.S. did not get any more similar messages from R.M. after this incident.

On December 13, 2016, J.M.S. stood up on a table during lunch and screamed "I'm not a fucking faggot." Doc. 72-15 at 20. Everyone started clapping. J.M.S. did this because they were playing "What are the Odds?"—a truth or dare type game. J.M.S. explained that this game involves counting down from three, then saying a number—one, two, or three—at the same time. If you say the same number, the person who was dared by the other must complete the dare. The dare was A.S.'s idea, and so, when J.M.S. and A.S. said the same number, J.M.S. completed the dare "because [he's] not [a "faggot"] and [he] hates when people say that." *Id*. He "was getting tired of people thinking that and saying that, so [he] stood up on a lunch table and screamed it." *Id.*

Principal Klaver witnessed this incident and texted S.E.S. Principal Klaver described the incident and how students had clapped and laughed. S.E.S. testified that Principal Klaver told her J.M.S. "seemed to be fine." Doc. 72-8 at 20. Principal Klaver told S.E.S. to let her know if there was anything more to it than a dare, and S.E.S. explained "Well, it's probably because he's sick and tired of everything he's dealing with and people not listening to him . . . [t]he thing with R.M., . . . the getting called fag all the time . . . ." *Id.* at 20–21. S.E.S. told Principal Klaver to punish J.M.S. for the disruption, if needed. S.E.S. did not ask Principal Klaver to do anything else as a result of the incident.

Principal Klaver also talked with J.M.S., who told her he had made the statement on a dare. J.M.S. told her that he was "sick of being called a faggot." Doc. 72-15 at 21. Principal Klaver's version of their conversation was that J.M.S. told her "last year everyone was calling him 'gay' or 'fag,'" which led to the dare during lunch. Doc. 72-3 at 5. Principal Klaver

testified that she asked J.M.S. if anything was going on this year and he said no. She told J.M.S. that if anything happened to him to let her know. J.M.S. never went back to Principal Klaver with any concerns, however. J.M.S. was not disciplined for this lunch room incident.

On March 15, 2017, minor male E.O.'s girlfriend, S.G., texted him during her golf practice alleging that J.M.S. had touched her rear end. E.O. then texted J.M.S. J.M.S. told E.O. the allegation was not true and an argument ensued after practice. Both E.O. and S.G. continued to message J.M.S., and J.M.S. was adamant he did not do anything intentional. J.M.S. "handled it himself" and told E.O. he was never disrespectful of women and "would never do anything like that." Doc. 72-15 at 21. E.O. ultimately apologized. And J.M.S. doesn't believe he had any problems with E.O. or his girlfriend after this exchange. J.M.S. doesn't know why the accusation was made in the first place but testified it probably occurred so that E.O. and his girlfriend had drama with J.M.S., to look cool and fit in. J.M.S. did not report this incident to the golf coach.

J.M.S. did tell S.E.S. about the incident and shared the messages with S.E.S. S.E.S. messaged Coach Thompson about the incident, but Coach Thompson reported that she had not seen anything. Coach Thompson also reported that the kids at issue were not together during practice except while the students were walking back to the bus. Coach Thompson told S.E.S. she would talk to Principal Klaver about it the next day. S.E.S. also called Principal Klaver at home about the incident. Principal Klaver agreed to talk to the students the next day. J.M.S. told E.O. and S.G. they could discuss the issue with Principal Klaver; then E.O. and S.G. started backing off their accusations. Doc. 72-8 at 21–22.

Coach Thompson testified that Principal Klaver brought the students in to talk to them. Principal Klaver then asked Coach Thompson about the incident after talking to the students.

S.E.S. and K.D.S. tried to follow up with Principal Klaver about the incident, but she told them she could not discuss discipline involving other students.

J.M.S. went on a date with minor female K.I.—who had just broken up with her boyfriend. On March 16, 2017, K.I.'s ex-boyfriend—J.F.—who was not a student attending school in the defendant school district, got "super mad" and posted about it on social media. Doc. 72-15 at 22. J.M.S. testified that this ex-boyfriend said in the post that he was "going to beat [J.M.S.'s] ass." *Id.* And J.M.S.'s friends, including Galena student H.P., liked and commented on J.F.'s post. Commenters mocked the post, which included a screen-shot of J.M.S's profile. S.E.S. testified that the post had around "two hundred and some likes, or some absurd amount of likes" many from the same Galena students who had been bullying J.M.S. Doc. 72-8 at 23. Student G.F., who was on the golf team with J.M.S., put a bunch of laughing emojis on the post. And, the next day, student H.P., also a fellow golfer, commented on the social media post, calling J.M.S. a "bitch."

J.M.S. assumed J.F. made the post because he was jealous that K.I. was talking to J.M.S. and not him. J.M.S. did not report the post to the district, however, because J.F. was not a student attending school in the district, and he "didn't think they could do anything [about] somebody from a neighboring school." Doc. 72-15 at 23. J.M.S. told S.E.S. about the post. S.E.S. also did not notify the school about J.F.'s posting because it was not made by a student attending school in the district. S.E.S. testified she did call Principal Klaver about H.P.'s comment on the post.

Principal Klaver testified she was aware of the incident because S.E.S. had posted a screen-shot of the post and comments on Facebook, including the comment by H.P., in which

H.P. had called J.M.S. a "bitch."[29]  Doc. 72-3 at 6.  S.E.S. had tagged students and their parents

in her post, and upset parents called Principal Klaver to complain about S.E.S. tagging children

in her post and calling them out.  *Id.* at 6–7.  Principal Klaver then called S.E.S. and told her that

she "can't control what children do on social media" but "since it happened at lunchtime, [she]

could discuss the incident with H.P. and [she] could do an investigation."[30]  *Id.* at 6.  But, by the

time S.E.S. and Principal Klaver talked about the incident, H.P. and J.M.S. "had already gotten

into a fistfight."  *Id.*; *see also* Doc. 75-10 at 5.

Indeed, on March 17, 2017, J.M.S. got into a fight with H.P. in the locker room before

physical education class.  J.M.S. confronted H.P. about his comment online that J.M.S. was a

"bitch."  Doc. 72-15 at 24.  H.P. admitted making the comment, called J.M.S. a "fag" and a fight

ensued.  *Id.*  S.E.S. believes the fight would not have happened if H.P. had not called J.M.S. a

"fag."  J.M.S. was not disciplined for this fight because no one from the school district knew

about it.  But then, in physical education class, H.P. kept talking and tried to trip J.M.S.  So,

J.M.S. turned around and punched him in the mouth.[31]  Doc. 72-15 at 23.  H.P. then hit J.M.S.

Doc. 72-3 at 8.  The teacher, Mr. Dawes, interceded and told the boys to stay away from each

other.  The class then proceeded as normal.  After class, Mr. Dawes asked the boys what

happened, and when J.M.S. told him they had gotten into a fight, Mr. Dawes sent both boys to

the office.  S.E.S. testified that Principal Klaver communicated to her and K.D.S. that she had

---

[29]     J.M.S. testified that he didn't expect the school district's employees to stop H.P. from commenting on a social media post.  But, he did expect them to talk to him and try to stop him from doing it in the future.

[30]     It is unclear whether S.E.S. called Principal Klaver first, or the other way around.  But, each participant testified that they called the other. It appears from Principal Klaver's testimony that H.P. may have posted his comment during school hours.  *See also* Doc. 72-15 at 23 (J.M.S. testified that H.P. had posted the comment in the morning and J.M.S. learned about it when his parents told him.).

[31]     When the fight was reported to Principal Klaver, she testified that her "understanding was that [J.M.S.] went up and hit [H.P.] from behind."  Doc. 72-3 at 7.  On summary judgment, the court views the facts in the light most favorable to plaintiff as non-movant.  So, it accepts J.M.S.'s version of these events.

told H.P. not to say things on social media that you wouldn't say to that person's face.  Both boys were suspended.  J.M.S. served his suspension on March 27, 28, and 29.

J.M.S. testified that he did not return to Galena Middle School after his suspension. Instead, he enrolled to attend school in the nearby Joplin, Missouri public school district during spring break of 2017.  S.E.S. described the timing of J.M.S.'s transfer in a slightly different fashion.  She explained that J.M.S. did not want to return to Galena.  So, S.E.S. took him to several schools in the area to try to facilitate a transfer.  One school district would not accept J.M.S. because it was too late in the school year.  Two other school districts were close by, but that proximity meant J.M.S. would encounter more of the same harassment because of the students' familiarity with one another in the Galena district and the other districts.  So, S.E.S. testified they were "going to try to make the best of this for the few months" remaining during the school year.  Doc. 75-10 at 5.  Then, the first day back at Galena Middle School after his suspension, J.M.S. tried to sit down at lunch.  But, A.S. called him a "bitch" and told him he had been replaced and could not sit there.  J.M.S. called S.E.S. and asked her to pick him up.  She testified that J.M.S. told her he was "not going to school here ever again, I would rather die."  *Id.* According to S.E.S.'s testimony, this was J.M.S.'s last day at Galena Middle School.  J.M.S.'s parents informed the school he would not return.  Doc. 75-12 at 9.

Throughout J.M.S.'s time at Galena Middle School there were other times where he was called names other than those described above, but J.M.S. has little or no memory of these. S.E.S. testified that J.M.S. "was called a fag every single day for a year and half."  Doc. 75-10 at 21.  There were times where he was called names without any social media postings, text messages, or other tangible product resulting from those instances.  J.M.S. did not keep track or count the number of times where he was called names that involved his sexual orientation

because "[t]here was too many of them to keep track of because it happened too often." Doc. 72-15 at 32. Neither S.E.S. nor J.M.S. reported all of the name-calling instances to the district. J.M.S. testified that he "had many meetings with superintendents, principals, [and] teachers. No one had [done] anything." Doc. 72-15 at 24. J.M.S. explained that people tried, but could not make anyone do anything. He also never learned why people were making "gay" and "fag" comments to him, despite asking a couple of people who made the comments. They did not answer his question with a real answer. Some of the perpetrators were J.M.S.'s friends and he testified he thought they might be calling him those names to fit in with others, become more popular, and be part of the mainstream group. Doc. 72-15 at 15–16.

Defendant acknowledges that, during the time J.M.S. was a student attending school in the Galena district, he was called names such as "gay, fag, faggot, homo, [and] locker room" by other students. Doc. 75-19 at 10. When asked "as best as you can recall" about all the times this name-calling of J.M.S. was brought to his attention, Assistant Principal Strickland testified that he took action to address the situation or report it to the principal. He also testified that he never met with Principal VanCleave or Superintendent Smith to discuss the bigger picture about events outside of the individual situations that arose. Principal Klaver testified that, during the 2016-2017 school year, J.M.S. never reported to her that anyone was bullying him or picking on him.[32]

### *Defendant's Policies and Procedures*

Defendant maintains several written policies and procedures that prohibit discrimination and harassment based on sex or gender, including sexual harassment, and provides these policies to its employees and staff. Doc. 67 at 2–4. These policies prohibit discrimination against individuals on the basis of sex in the school district's programs and activities and provide that

---

[32] Plaintiff included a number of additional facts that are not material to the court's summary judgment analysis and thus are not detailed here.

defendant is committed to maintaining a learning environment free from discrimination on the basis of sex, including sexual harassment.

Defendant's "Board Policy GAAB—Complaints of Discrimination" provides that complaints of discrimination should be reported to an employee's supervisor, the principal, or the compliance coordinator and that complaints of discrimination will be resolved using defendant's complaint discrimination procedures.

Defendant's "Board Policy JCE—Complaints" provides that a student may file a complaint with the principal, another administrator, the guidance counselor, or another certified staff member[33] and that complaints of discrimination will be resolved using defendant's complaint discrimination procedures.

Similarly, defendant's "Board Policy JGEC—Sexual Harassment" directs any student who believes he or she has been sexually harassed to discuss the alleged harassment with the school building's principal, another administrator, the guidance counselor, or other certified staff member. "If the matter is not resolved to the satisfaction of the student in this meeting, the student may initiate a formal complaint under the district's complaint procedure." Doc. 75 at 14; Doc. 67 at 4.

Defendant's "Board Policy GAAC—Sexual Harassment" and defendant's "Board Policy JGEC—Sexual Harassment" provide that all forms of sexual harassment are prohibited at school, on school property, and at all school-sponsored activities, programs, or events. And, these policies provide that sexual harassment against individuals associated with the school is prohibited, whether the harassment occurs on school grounds or elsewhere. Also, these policies provide that sexual harassment complaints will be promptly investigated and resolved, and that

---

[33] It is not clear from the record who constitutes a "certified staff member."

retaliation is prohibited against any person who files a complaint, testifies, or participates in a sexual harassment investigation.

Defendant's "Board Policy KIN—Complaints" designates the Clerk of the Board of Education to coordinate compliance with Title IX's nondiscrimination requirements. Defendant's "Board Policy KN-R—Complaints" provides for informal and formal compliant procedures and appeals to the Board of Education. This policy directs that all complaints should be resolved at the lowest possible administrative level. At the lowest level, the district tries to train and counsel students to solve differences themselves. The next lowest level is the coach and teacher level. Above that level is the administration at the school, followed by the superintendent, and finally, at the Board of Education level.

Defendant also has a "Bullying Prevention Plan," which provides that bullying will not be permitted or tolerated. Doc. 72-1 at 1. Bullying is defined to include, among other things, "intentional written, verbal or physical act or threat that is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for a student . . . that a reasonable person, under the circumstances, knows or should know" could harm a student physically or mentally. *Id.* Bullying also includes any sexual harassment in violation of the district's sexual harassment policy. For, "Reporting," the Plan provides that:

> Students may report any bullying incident to any adult employee of the Galena School District. Once they have received a report from a student, it is the responsibility of the employee to promptly contact the principal of the building and inform him/her of the complaint. A letter box will be placed in a location accessible to all students in each building, so students who feel unable to talk to staff can have a point of contact. Once a report has been made, it is the responsibility of the building principal or his/her designee to investigate the incident, and act according to the policies of the Galena School District.

*Id.* at 4.

This Bullying Prevention Plan is included in the student handbook and also is brought to the attention of teachers and administrators annually.  Doc. 72-3 at 9.  School administrators also review student and staff handbooks, including bullying and related policies with the staff at the beginning of each year.  Doc. 72-2 at 8–9; *see also* Doc. 72-6 at 7–9 (Jodi Russell testified at the beginning of the year teachers are trained on reporting bullying and harassment and review the district's policies.); Doc. 72-3 at 9 (Principal Klaver stated that the teachers and administrators also discuss what bullying means, how to handle bullying, and what the district does to prevent it before school starts each year.).  Principal VanCleave, as the district's representative, testified that teachers also review the school policies on bullying and sexual harassment at the beginning of each year with the students in their class.  Doc. 72-2 at 8–9.  Jodi Russell explained the school provides the district policies and procedures to all students with their planners at the beginning of the school year.  J.M.S. agrees that a copy of the student handbook was included in his planner, but testified that "we were never made to go over it, so no one read it."  Doc. 72-15 at 30.  J.M.S. read the handbook only after he was suspended and was shown "what the punishments were in the handbook" for fighting.  *Id.*  J.M.S. was aware of defendant's bullying policy.  *Id.* at 31.

The Bullying Prevention Plan also contains requirements for character development programs "to encourage anti-bullying behavior" as well as bullying training for all staff members.  Doc. 72-1 at 3.  Defendant sometimes has "Character Ed" programs for the students that sometimes focus on bullying or sexual harassment.  Doc. 72-2 at 8.

The Bullying Prevention Plan also directs each building to "gather bullying data [from Bullying Discipline Referrals and School Climate Surveys] and report the results to the Board of Education at the end of each school year."  Doc. 72-1 at 4.  And, it directs each building to establish a bullying committee to coordinate the school's bullying prevention program, which

should include "the building principal, one counselor, at least one teacher, a parent, and at least one student." *Id.*

Principal VanCleave and Superintendent Smith testified that Galena Middle School had a "bullying committee" or "site council" made up of parents, students, teachers, and administrators. Doc. 72-4 at 3 (explaining for a smaller district they "kind of used our site [councils] as bullying committee[s]" and that it should have had students, teachers, and parents involved); Doc. 72-2 at 7 (explaining the title of the bullying committee was the site council, bullying was "some of the things" addressed at those council meetings, and that the council was made up of more than one person from each subgroup set out in the Bullying Prevention Plan). The site council met two or three times a year and, one of its jobs was discussing school climate, bullying, and discipline. Doc. 72-2 at 7.

According to Superintendent Smith, the building principal typically facilitated the meetings and should have minutes or agendas. Doc. 75-13 at 2–3. But, defendant did not produce any agendas, minutes, member rosters, or attendance records for meetings of any bullying committee or site council for the years 2011-2017. Doc. 75–26 at 2–3 (objecting to the request as over broad in scope and seeking documents not relevant to plaintiff's claim, and stating that it "is not aware of any documents responsive to this Request"). Superintendent Smith assumed teachers on the site council would rotate. And, he thought members of the site council would know that the council also was functioning as the bullying committee. But, he also testified that he could not say whether the parents or students serving on the council would know they also were serving on the bullying committee. He did not know if the agenda for the site council meetings would show that it also was a meeting of the bullying committee, though

he was "pretty sure" bullying would have been a topic for the agendas and deferred to the principals to answer that question.  Doc. 75-15 at 3.

When asked, some faculty members neither had heard of nor served on a bullying committee and did not know which faculty members had served.  Coach Ryan does not recall if there was a bullying committee and he did not serve on a bullying committee during the last two years of his employment.  He also does not know anyone who served on the bullying committee. He believes that the school had a site council though.  But, he does not remember if he was ever on a site council and testified that, though he had heard the term, he was "honestly not sure what the site council was," and could not say who served on it, what it did, or how often it met.  Doc. 72-11 at 4.  Coach Williamson testified similarly—he did not serve on a bullying committee, he doesn't remember hearing of one, and does not know anyone who has served on a bullying committee.  He does remember a site council, but does not recall who served on it or what topics they took up.  Doc. 72-12 at 5; Doc. 75-24 at 2.  Tamara Ballentyne does not know if her school has a bullying committee and she has not served on it.  Doc. 75-25 at 8.  Diana Moss also has not served on a bullying committee and could not identify any adults within the district who had served on such a committee.  Doc. 75-23 at 4.  Coach Thompson does not know about a specific bullying committee, and she had not served on and was not aware of anyone serving on such a committee.[34]  Doc. 72-7 at 8.  Jodi Russell, on the other hand, was aware of a safety committee and testified she believes the bullying committee "falls under that [committee's] umbrella." Doc. 72-6 at 6.  Ms. Russell never had served on that committee.

The district's representative testified that if a teacher determines that an incident was bullying, and not merely a conflict between students, the teacher must report the behavior

---

[34]     Coach Thompson is employed by defendant only as a coach, not a teacher.

verbally or in writing. Doc. 75-19 at 2. When asked what the district's policy is about the form of the report, the district's representative testified, "We ask teachers to submit in writing . . . a documentation of the incident that happened and the people involved," which they can submit in digital form. *Id.*; Doc. 72-2 at 5. Between July 1, 2011 and June 30, 2016, the district could recall five specific incidents of bullying that were reported and recorded in the district's records. The district's representative testified more reports were recorded, but, when testifying, the district's representative could remember and provide specific knowledge about only five incidents involving five different victims, one of whom was J.M.S. Doc. 72-2 at 6. The incident submitted involving J.M.S. was when D.O. stuck his hands down his pants, then rubbed them on J.M.S.'s face in May 2016. The other four incidents involved elementary school students.

The district's representative also testified that the district doesn't log entries in the system "when we just conference with kids." Doc. 75-19 at 4. And, in response to a few hypothetical scenarios, the district's representative explained whether an incident would require a written report or entry into the data log would depend on the supervisor.[35] Essentially, if the students had been counseled and the administrator thought the situation wasn't bullying and was resolved, it may not be reported in the system. If the administrator determined bullying had occurred, "they would be punished with after school detention, ISSs, time out of school, [or] Saturday school," which is recorded. *Id.* But, whether punishment was implemented and recorded on the first or second offense depends on the situation and is determined in the administrator's discretion. For repeat offenders, the punishment likely would escalate. Also, it is up to the

---

[35] Defendant objects to the following explanations of how incidents may be handled within the district, arguing plaintiff has "mischaracterize[d] and misstate[d] the witness's testimony" and contending "the witness's responses to hypothetical questioning should be disregarded." Doc. 80 at 75–77. But, defendant never cited a rule of evidence or any other legal authority for its conclusory assertion that the questions are improper. The court reads the district representative's testimony as examples to explain how defendant's policies about bullying and reporting are implemented in practice and overrules defendant's objections.

administrator who meets with the students to determine if he should label the incident as bullying or sexual harassment, and whether he should document the incident and conference with the students even where no punishment is implemented. Even if a teacher or administrator believes bullying or sexual harassment had occurred, it may not be reported in the reporting system if they believed the incident was resolved through a conference with the student. The administrator exercises discretion whether to record the incident in the system where counseling has occurred without any other discipline. "Things that are entered in Power School"—the district's record system—"are passed the counseling level most of the time." Doc. 75-19 at 9.

The district's representative testified that the district resolves most matters of bullying and sexual harassment at the student-on-student, teacher-student, or principal administrative level—*i.e.*, the lowest possible administrative level as directed by Board Policy KN-R—Complaints. Teachers exercise discretion when deciding how to resolve an issue, unless it requires automatic referrals to the office.

Jodi Russell testified that it is mandatory for teachers to report bullying or harassing incidents to the principal, though a particular form is not required. The teacher, depending on the situation, could elect to send an email, write it up on a form, or go talk to the principal. Doc. 72-6 at 6–7. It is Ms. Russell's understanding that harassment includes verbal harassment, and would include statements that demean a student's sexual orientation or perceived sexual orientation. And, Jodi Russell responded to questions about how she handles bullying or harassment. Asked about a hypothetical scenario—if she heard a student call another student "fucking fag"—she probably would deem that bullying, feel obligated to report it, and would do so by writing it up and referring the student to the office.[36] Coach Thompson had a similar

---

[36] Defendant objects to plaintiff's attempt to "improperly use the hypothetical testimony of the witness" and argues Ms. Russell's testimony is "immaterial because no evidence has been presented that any teacher overheard

understanding in terms of what harassment includes.  Also, she agreed that, if a staff member observes harassment, reporting it was mandatory.  Doc. 72-7 at 9.  She testified that she never has been involved in an investigation of student-on-student sexual harassment or heard of the district conducting such an investigation.

Jodi Russell testified that defendant had a "bully box" at one time.  Doc. 72-6 at 6.  Also, there is a form on defendant's website where bullying can be reported anonymously.  *Id.*  Coach Thompson testified the school has a bully box in the office as well.  Doc. 72-7 at 8.  Jodi Russell has never submitted a bullying report using the online form.  Diana Moss never has filed a bullying report with the district and she is not aware of any other teachers or staff doing so.  Doc. 75-23 at 4.

Diana Moss testified that she is not aware of any student in Galena who was disciplined for bullying another student in recent years.  Doc. 75-23 at 7.  But, it is her understanding that the district has a zero tolerance policy for fighting, student-on-student sexual harassment, and student-on-student bullying.  She is aware that the district has suspended students for violating the zero tolerance policy for fighting, but is not aware of any suspensions for violating the zero tolerance bullying policy or zero tolerance sexual harassment policy.

Student climate surveys are conducted by the Kansas Communities that Care, and the survey results are compiled into reports.  The surveys are distributed to sixth, eighth, tenth, and twelfth grade students, *i.e.*, the students have the opportunity to take the survey every two years.  Not all students participate—some parents opt their children out of the survey.

---

another student call [J.M.S.] this word and failed to report it."  Doc. 80 at 72–73.  But, defendant never cited a rule of evidence or any other legal authority for its conclusory assertion that Ms. Russell's responses to hypothetical questions are improper.  The court reads Ms. Russell's testimony as examples to explain how defendant's policies about bullying and reporting were intended to work and overrules defendant's objection.

The reports include data on "student opinions and perceptions on bullying at school." Doc. 75-6 at 6–9; Doc. 75-7 at 9–13. The reports do not address the nature or type of bullying; instead, the survey asks general questions about the frequency of and responses to bullying. And they compare the district's data to state-wide data. For example, the report for the 2013-2014 year shows the percentage of students who "reported yes (sometimes, regularly, or everyday)" to the question: "During this school year, how often have you seen someone being bullied?" Doc. 75-6 at 6. 67.46% was reported for the district, compared to 60.51% state-wide. *Id.* Participation across all grades surveyed in defendant's district for this 2013-2014 report was 68.83%. Doc. 75-6 at 2.

Superintendent Smith testified that he would have looked through the 2013-2014 report. When asked if the "prevalence of students reporting experience with bullying" became a concern to him (based on the report, not the above illustrative example), Superintendent Smith said "Well, I think it's always a concern. If one student is being bullied, it would be a concern to me. So, yes." Doc. 72-4 at 4.

Principal VanCleave, as the district's designated Rule 30(b)(6) representative, testified that he didn't know if a school climate survey was conducted for the 2015-2016 school year. He also testified that the middle school did not report incidents of bullying to the Board of Education at the conclusion of the 2015-2016 school year. Principal Klaver testified that the Board of Education has access to the school's database, where it can access the school climate surveys. And she states that, under the Bullying Prevention Plan, she does not have to report bullying data at a formal board meeting. Instead, it can be reported via the database or through a bullying report in between school board meetings. Doc. 80-1 at 3. Superintendent Smith also believes he visited with the Board of Education about data gathered on bullying and issues. Doc. 72-4 at 4.

Diana Moss remembers a couple of times when the administration provided her information about school surveys reporting experiences with bullying. She recalls that, in a group staff setting, "we were discussing different levels of comfort that kids felt within the district and that some felt safe and some felt like bullying was an issue." Doc. 75-23 at 3–4. They then reviewed the steps in the district's Bullying Prevention Plan, and an administrator made sure they understood the contents. Diana Moss was asked in her deposition to consider the survey results from the 2013–2014 report where 67.46% of surveyed students reported they had seen someone bullied. She considered that percentage to be a troubling result. Doc. 75-23 at 5.

Employees also undergo other training about bullying and harassment. Diana Moss testified that some of her professional development training, while the advertised subject matter may not have been bullying specifically, has included elements concerning bullying. Doc. 72-5 at 4. Assistant Principal Strickland testified that he received training about bullying and bullying prevention. Doc. 72-10 at 11. Teachers in the district were required to watch video webinars about bullying beginning with the 2014-2015 school year. Doc. 72-2 at 9–10. Jodi Russell explained that every three or four years, the teachers receive formal training about sexual harassment and bullying and also, teachers are encouraged to secure their own training about bullying and sexual harassment. Doc. 72-6 at 8.

## IV.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1460 (D. Kan. 1995). When it applies this standard, the court "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d

1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012) (explaining that "[a]n issue of fact is 'genuine' if 'the evidence allows a reasonable jury to resolve the issue either way.'" (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006))). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Nahno-Lopez*, 625 F.3d at 1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1150 (explaining that "a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim." (citation omitted)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169. (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Finally, summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1). "The very purpose of a summary judgment action is to determine whether trial is necessary." *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

## V.      Defendant's Summary Judgment Motion

Defendant seeks summary judgment against plaintiff's claim for sex or gender harassment violating Title IX.

Title IX of the Education Amendments Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Courts generally assess Title IX discrimination claims under the same legal analysis applied to Title VII claims. *E.g.*, *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001). And, courts "readily conclude[] that same-sex student-on-student harassment is actionable under Title IX to the same

extent that same-sex harassment is actionable under Title VII." *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 963 (D. Kan. 2005) (citing *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65–66 (1st Cir. 2002)).  Unlike Title VII cases, courts in Title IX cases "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).

The Supreme Court has provided three instructive evidentiary methods that a plaintiff who is the same sex as his harasser may use show that the harassment was based on sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  These methods permit such a plaintiff to show that:  (1) the harasser is motivated by sexual desire, (2) the harasser is motivated by general hostility to the presence of having another person of the same gender as the harasser in the workplace, or (3) direct comparative evidence showing how the harasser treated both males and females in the workplace. *Id*. at 80–81.  But these three evidentiary methods are not exhaustive. *Theno*, 377 F. Supp. 2d at 964.

Courts have held that gender stereotyping is another method for proving that same-sex harassment is based on sex. *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989)).  Under the gender stereotyping method, a plaintiff must show that his harassers were acting to punish him for failing to conform to the stereotypes about the plaintiff's gender. *Id*.  "Whatever evidentiary route the plaintiff chooses to follow," to succeed on a Title IX sex or gender discrimination claim, a plaintiff must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." *Oncale*, 523 U.S. at 81 (internal quotation marks and alterations omitted).

Besides proving the discrimination occurred because of the victim's sex, a Title IX plaintiff must clear other hurdles. For a public school district who receives federal funds to be held "liable under Title IX for student-on-student sexual harassment," plaintiff also must prove that the school acted with "'deliberate indifference to known acts of harassment in its programs or activities,'" and that the "'harassment [was] so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit.'" *Theno*, 377 F. Supp. 2d at 963 (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)).[37] Defendant's motion for summary judgment relies on the first half of this standard. Namely, as explained below, it argues that the summary judgment facts present no triable issue whether defendant acted with deliberate indifference to known acts of harassment based on sex.[38]

---

[37] The Fifth Circuit aptly has identified the elements required by *Davis* as follows:

> A school district that receives federal funds may be liable for student-on-student harassment if the district (1) had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on the victim's sex, (4) the harassment was so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit, and (5) the district was deliberately indifferent to the harassment.

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (internal quotation marks, citations, and alterations omitted) (holding harassing conduct alleged by cheerleader failed to state a claim under Title IX as a matter of law).

[38] Defendant's summary judgment motion does not contest whether the alleged gender-oriented conduct rose to the level of actionable harassment—*i.e.*, whether it was so "severe, pervasive, and objectively offensive" that it deprived the victim "of access to the educational opportunities or benefits provided by the school." *See Davis*, 526 U.S. at 650–51. But, at trial, plaintiff also must show gender-oriented conduct that rises to this level. The Supreme Court has noted "the practical realities of responding to student behavior" by adding this requirement to show the harassment has a "systemic effect on educational programs or activities" in addition to the requirement to show "official indifference to known peer sexual harassment." *Id.* at 653. The Supreme Court has cautioned:

> Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Id.* at 651–52.

Defendant makes four principal arguments why summary judgment is appropriate. *First*, defendant contends that the uncontroverted facts cannot support a finding that J.M.S. was harassed because of his sex. *Second*, defendant argues that J.M.S. and S.E.S. did not report some harassment to the required level of official within the school district. *Third*, defendant argues that J.M.S. and S.E.S. did not provide defendant sufficiently detailed notice of the alleged sexual harassment—*i.e.*, the evidence does not support a finding that defendant had actual knowledge of harassment based on sex. *Last*, defendant argues that the uncontroverted facts cannot support a finding that the district acted with deliberate indifference. The second, third, and fourth arguments are all tied to the "deliberate indifference to known acts of harassment" elements. The court addresses each of defendant's arguments, in turn, below.[39]

### A. Harassment *Based on* Sex

*First*, defendant argues that the evidence cannot support a finding that J.M.S. was discriminated against *because of* his sex. As noted above, a plaintiff must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." *Onacle*, 523 U.S. at 81 (internal quotation marks and alterations omitted). Harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* at 80.

One method a Title IX plaintiff may use to prove harassment occurred because of sex is by showing he was discriminated against because he failed to conform to gender stereotypes. *Theno*, 377 F. Supp. 2d at 964 (collecting cases that "have held that this gender stereotyping

---

[39] Defendant also asserts that defendant and its employees, as government officials, are presumed to have acted in good faith. Doc. 72 at 44–45; Doc. 80 at 82–83. Citing only cases outside the Title IX and Title VII context, defendant suggests that plaintiff also must rebut or overcome this presumption. *See* Doc. 72 at 45. Neither the Supreme Court nor our Circuit has hinted that overcoming this presumption is an element of a Title IX case.

theory provides another method . . . for proving that same-sex harassment is based on sex"). But, binding precedent is clear: Tenth Circuit law does not recognize a claim for harassment based on a plaintiff's sexual orientation or perceived sexual orientation. *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005) (recognizing a claim may exist where the evidence shows "the harasser was acting to punish the plaintiff's noncompliance with gender stereotypes," but affirming district court's grant of summary judgment for defendant and holding Title VII does not recognize a claim based on sexual orientation where plaintiff had alleged she was discriminated against because she was a heterosexual woman, who acted differently than her lesbian co-workers).

Here, plaintiff relies on the gender stereotyping method to prove actionable harassment based on sex. Defendant contends the conduct plaintiff relies on to support her claim (asserted on student J.M.S.'s behalf) does not establish that the motives behind the students' actions were fueled by J.M.S.'s failure to conform to stereotypical expectations of masculinity. Instead, defendant asserts, plaintiff cannot show why the other students engaged in the alleged bullying or harassing conduct. And, defendant argues, how J.M.S. dressed, wore his hair, and behaved are not "characteristics which can be considered [] non-masculine in nature sufficient to establish sex based harassment under Title IX." Doc. 72 at 47–48. Defendant notes the undisputed facts show that J.M.S. played sports, had girlfriends, and instigated fights, and he is "not alleged to have displayed any effeminate attributes." *Id.* at 48.

In *Theno*, this court considered whether a variety of harassing conduct, including name-calling "with various sexual overtones" such as "fag," "gay," and "flamer" and rumors about plaintiff masturbating at school, could constitute harassment based on sex. *Theno*, 377 F. Supp. 2d at 954–56, 964–65. *Theno* concluded that "a rational trier of fact could infer that the plaintiff

60

was harassed because he failed to satisfy his peers' stereotyped expectations for his gender because the primary objective of plaintiff's harassers appears to have been to disparage his perceived lack of masculinity." *Id.* at 965; *see also Schmedding v. Tnemec Company, Inc.*, 187 F.3d 862, 865 (8th Cir. 1999) (reversing district court's order granting motion to dismiss a Title VII claim and holding complaint stated sufficient claim that discrimination was based on sex, not sexual orientation, despite conduct including, among other things, taunting plaintiff as homosexual, where plaintiff argued it was done "in an effort to debase his masculinity, not . . . because he *is* homosexual or *perceived* as being homosexual");[40] *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1090–93, 1098 (D. Minn. 2000) (holding plaintiff's Title IX sexual harassment claim survived a motion for judgment on the pleadings and summary judgment motion where harassment included, among other things, "name-calling and other forms of verbal abuse [that] repeatedly indicated [the harassers] perceived plaintiff to be homosexual" because, while the misconduct could have been based on his perceived sexual orientation, the facts also supported a claim that he "did not fit his peers' stereotypes of masculinity").[41]

---

[40]    The harassing conduct alleged in *Schmedding*, a Title VII case, included plaintiff being "patted on the buttocks; asked to perform sexual acts; given derogatory notes referring to his anatomy; called names such as 'homo' and 'jerk off'"; as well as subjecting plaintiff "to the exhibition of sexually inappropriate behavior . . . including unbuttoning of clothing, scratching of crotches and buttocks; and humping the door frame to [plaintiff's] office." 187 F.3d at 865.

[41]    The male plaintiff in *Montgomery* was called a variety of names, including, among others, "faggot," "fag," "Jessica," "girl," "princess," "bitch," "homo," and "queer." *Montgomery*, 109 F. Supp. 2d at 1084. The court noted that a reasonable factfinder could infer from calling plaintiff "'Jessica,' a girl's name," that the harassers believed "he exhibited feminine characteristics." *Id.* at 1090. The court also found it important that the harassment began as early as kindergarten, when children may not have solidified a sexual preference or understand what it means to be "homosexual" or "heterosexual," so it was "much more plausible that the students began tormenting him based on feminine personality traits that he exhibited and the perception that he did not engage in behaviors befitting a boy." *Id.* Ultimately, the court denied defendant's summary judgment motion, finding plaintiff's allegations that "his harassers called him names targeted at homosexuals and spread rumors about his sexual orientation, as well as subject[ed] him to more severe forms of misconduct such as asking him for sexual favors, grabbing his buttocks and inter thighs, and subjecting him to acts of pretended anal rape" were sufficient to support a submissible Title IX claim for harassment based on sex. *Id.* at 1092–93, 1098.

*Theno* also recognized that ordinary name-calling alone probably was insufficient to withstand summary judgment.  377 F. Supp. 2d at 965; *see also Davis*, 526 U.S. at 651–52 (explaining that "[d]amages are not available for simple acts of teasing and name-calling among school children . . . even where these comments target differences in gender" unless, under the circumstances, the behavior is so "severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect"); *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165–66 (5th Cir. 2011) (concluding conduct merely was teasing or bullying because motivation of alleged harasser was "personal animus"—plaintiff was dating the harasser's ex-boyfriend and plaintiff's mom had gotten the harasser in trouble at school—not plaintiff's gender).  But, because the origins of the name-calling in *Theno* traced back to the rumor that plaintiff was caught masturbating at school, the court concluded a rational trier of fact could find that the harassers "believed that [plaintiff] did not conform to male stereotypes by *not* engaging in such behavior at school, i.e., that he did not act as a man should act." *Id.*

In *Medina v. Income Support Division*, the Tenth Circuit considered a gender-stereotyping theory in the Title VII context.  413 F.3d 1131.  The *Medina* plaintiff tried to assert a gender-stereotyping theory by alleging "she was punished for not acting like a stereotypical woman *who worked at* [the defendant-employer]—which, according to her, is a lesbian." *Id.* at 1135.  But, "there [was] no evidence . . . that [plaintiff] did not dress or behave like a stereotypical woman." *Id.*  So, the Tenth Circuit concluded her claim was based on her sexual orientation—not sex stereotyping—and held the district court properly had granted summary judgment against her Title VII claim. *Id.*

Here, viewing the evidence and drawing reasonable inferences in the light most favorable to plaintiff, a genuine issue of material fact precludes summary judgment. J.M.S. is not required to have come to school "wearing make-up or eye-liner, using nail polish, dressed in a skirt, carrying a purse or engaging in other behaviors that might be traditionally associated with being female," as defendant suggests is necessary, Doc. 80 at 84–85, for a reasonable jury to conclude J.M.S. was harassed because of a failure to conform to stereotypical expectations of masculinity. Instead, a reasonable jury could conclude he was harassed for failing to satisfy his peers' stereotyped expectations for his gender—*i.e.*, that the primary objective of the harassers was mocking his perceived lack of masculinity. *See Theno*, 377 F. Supp. 2d at 973–75 (explaining that the Supreme Court has recognized a "failure to conform to gender stereotypes" theory of harassment, and this theory does not necessarily require evidence that the plaintiff was effeminate); *see also EEOC v. Grief Bros. Corp.*, No. 02-CV-468S, 2004 WL 2202641, at *12–15 (W.D.N.Y. Sept. 30, 2004) (collecting cases and concluding evidence to support plaintiff's gender stereotyping sex discrimination claim could include the fact he wore an earring, but also that he "refused to engage in daily discussions about women, sexual fantasies, the female anatomy, penis size, oral and anal sex and sexual encounters with women, and otherwise rebuffed his harassers attempts to engage him in offensive discussions" and that he "was subjected to taunts disparaging his masculinity, such as 'fag'").[42]

J.M.S. conceded he did not know why the other students had called him names and picked on him. But, the admissible evidence nonetheless can support a reasonable finding that J.M.S.'s harassment traces back to when he got a distinctive haircut and changed his style in seventh grade. A reasonable jury could infer that the alleged harassers used the "Locker Room"

---

[42]     The plaintiff in *Grief Bros.* was homosexual, but his co-workers did not know his sexual orientation or think he was homosexual. 2004 WL 2202641, at *10–11.

nickname and other terms suggesting homosexuality because of the way J.M.S. looked, dressed, and behaved, as compared to other male students at his school—and not because he was homosexual, or because students perceived him to be homosexual.

The record includes admissible evidence that J.M.S. did not dress like other male students and wore a different hair style. Superintendent Smith believed students may have picked on J.M.S. because of the way he dressed. Tamara Ballentyne testified that she believes J.M.S. was bullied, in part, because he dressed well and styled his hair. She also stated that J.M.S. did not fit with the student culture at Galena Middle School. A.R.D., S.D.K., and G.P. explained students began making fun of J.M.S. because he got a distinctive haircut in seventh grade. A reasonable jury could find that the use of the words "gay," "fag," and other name calling was associated with "the way [J.M.S.] looked," Doc. 75–2 at 1; Doc. 75–3 at 1; *see also* Doc. 75-4 at 1, and not his sexual preference.

This conclusion doesn't mean that every student who is subjected to name-calling because of the student's looks will recover for harassment based on gender, or failure to conform to gender stereotypes. Here, the evidence in the summary judgment facts could produce a rational finding that the alleged discrimination underlying J.M.S.'s claim was based on his perceived sexual orientation—or resulted from reasons completely unrelated to J.M.S.'s gender or perceived sexual orientation. But, the opposite is equally true: a rational trier of fact also could conclude the harassers' comments were based on J.M.S.'s failure to conform to the other male students' stereotypes for masculinity—*i.e.*, how a stereotypical middle school aged boy should look and act. For instance, E.O. and J.O. questioned why J.M.S.'s girlfriend would date someone like J.M.S. and suggested a different—one could infer, more masculine—student could steal J.M.S.'s girlfriend away from him. On summary judgment, the court isn't free to weigh the

evidence and competing inferences and declare a winner. *Gossett*, 245 F.3d at 1175. To the contrary, jury must decide whether J.M.S.'s peers engaged in the conduct at issue here based on J.M.S.'s sex.

Because a rational trier of fact could infer the student-harassers' objectives were to criticize J.M.S.'s perceived lack of masculinity, a genuine issue of fact remains whether J.M.S. was discriminated against *because of* his sex. In sum, the court cannot conclude as a matter of law that the harassment here was based on something other than J.M.S.'s failure to conform to "his peers' stereotyped expectations for his gender." *Theno*, 377 F. Supp. 2d at 965, 971–75. The court thus denies defendant's request for summary judgment on this basis.

### B. Deliberate Indifference to Known Acts of Harassment

Title IX holds a federal funding recipient liable "for its *own* decision to remain idle in the face of known student-on-student harassment in its schools." *Davis*, 526 U.S. at 641. In this sense, Title IX doesn't impose liability on a school district because of the harasser's actions. To the contrary, Title IX imposes liability where the school district displays deliberate indifference to known acts of sexual harassment which effectively causes or subjects students to harassment (or makes them more vulnerable to it). *Id.* at 641–645.

This standard requires more than negligence. That is, a Title IX plaintiff cannot hold a federally funded school district liable merely for failing "to react to . . . harassment of which it . . . *should have* known." *Id.* at 642. Instead, a school district is liable only when it remains "deliberately indifferent to acts of . . . harassment of which it had actual knowledge." *Id.* And, the liability of the district is limited to "to circumstances where[] the [school] exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. In short, a school district cannot be held liable where it "could not have

remedied the harassment because it had no knowledge thereof or had no authority to respond to the harassment," *i.e.*, authority "to take remedial action." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999).

The next three subsections consider defendant's next three arguments. With these arguments, defendant contests whether plaintiff has adduced admissible evidence that can support a reasonable finding of the "actual knowledge" and "deliberate indifference" requirements.

### i. Reporting to Appropriate Officials

Defendant's *second* argument for summary judgment contends that J.M.S. and S.E.S. failed to report the harassment to the appropriate level of official within the school district, as Title IX requires. Defendant concedes that S.E.S. and J.M.S. reported some of the alleged harassment based on sex to appropriate school officials. But, defendant argues, any conduct reported to "[l]ower level employees like teachers and guidance counselors are not appropriate officials." Doc. 72 at 48. So, defendant contends, only conduct reported to a principal or higher level school official can form the basis of plaintiff's claim.[43]

Plaintiffs asserting a Title IX claim must show that "they brought the situation to the attention of an official at the educational institution receiving Title IX funds who had the 'authority to take corrective action' to remedy the harassment." *Morse v. Regents of the Univ. of Colo.*, 154 F.3d 1124, 1127–28 (10th Cir. 1998) (reporting harassment to university dean and affirmative action officer was sufficient) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). The Supreme Court explained in *Gebser* that the school district must

---

[43]      For the first time in its Reply, defendant identifies the specific facts that, according to defendant, plaintiff failed to report to an appropriate official (or failed to supply sufficient detail) and cannot support plaintiff's claim. The court addresses these specific facts in Part IV.B.ii, below. For purposes of the current subsection, the court addresses only the "appropriate person" argument.

have "actual knowledge" of the conduct so that it has "an opportunity to take action to end the harassment or to limit further harassment." 524 U.S. at 289–90. This means the harassment must be brought to the attention of an "'appropriate person'"—*i.e.*, "at a minimum" an official who "has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Id.* at 290–91 (concluding that high school principal who had received a complaint about a teacher making inappropriate comments in class was not provided actual notice sufficient to alert the principal to the possibility that the teacher was having a sexual relationship with a student, and explaining that where the teacher is the harasser, his own knowledge is not the same as the school district's knowledge because "the knowledge of the wrongdoer himself is not pertinent to the analysis").

The Tenth Circuit has addressed the level of school officials who have "requisite control over the situation" for a school district defendant to have received "actual knowledge of" and have been "deliberately indifferent to, the alleged harassment." *Murrell*, 186 F.3d at 1247. And, in *Murrell*, the Circuit declined to limit the "appropriate official" requirement strictly to principals or higher level officials. *Id.* Specifically, the Tenth Circuit explained:

> We decline to simply name job titles that would or would not adequately satisfy this requirement. School districts contain a number of layers below the school board: superintendents, principals, vice-principals, and teachers and coaches, not to mention specialized counselors such as Title IX coordinators. Different school districts may assign different duties to these positions or even reject the traditional hierarchical structure altogether. Because officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry. ***Davis* makes clear, however, that a school official who has the authority to halt known abuse, perhaps by measures such as transferring the harassing student to a different class, suspending him, curtailing his privileges, or providing additional supervision, would meet this definition**.

*Id.* (emphasis added) (internal quotation marks, citations, and alterations omitted).

Applying this standard to the summary judgment record here, the evidence can support a finding that J.M.S. or S.E.S. reported the alleged harassing conduct to an appropriate-level employee. First, a reasonable jury could find their reports to Superintendent Smith, Principal Klaver, Principal VanCleave, or Assistant Principal Strickland (who was in charge of discipline) were made to officials who exercised substantial control over the alleged student harassers and they possessed authority to address and try to correct it—*i.e.*, a reasonable jury could conclude they are "appropriate persons" and, if they had received actual notice, the school district had received actual notice. *See Murrell*, 186 F.3d at 1247 (principal as highest ranking administrator in the school exercised substantial control over the harasser and the "school environment during school hours, so her knowledge may be charged to the School District"). And, defendant seems to concede as much—at least for the principals and superintendent—thus precluding that summary judgment as a matter of law based on defendant's second argument. *See* Doc. 72 at 48–49.

Also, to the extent teachers or coaches "exercised control over the harasser and the context in which the harassment occurred"—a fact-based inquiry—a rational trier of fact also could find that they meet the "definition of 'appropriate persons'" under Title IX. *See Murrell*, 186 F.3d at 1248 ("Where the victim is complaining about a fellow student's action during school hours and on school grounds, teachers may well possess the requisite control necessary to take corrective action to end the discrimination." (internal quotation marks and citation omitted)); *see also Montgomery*, 109 F. Supp. 2d at 1099 (rejecting defendant's argument that victim must give actual notice of student-on-student harassment to principal or higher official "[b]ecause teachers ordinarily maintain at least some level of disciplinary control over their students, [and] it is reasonable to infer they had authority to take disciplinary action and to

institute other corrective measures to end the harassment," and noting that district policy required teachers to report sexual harassment, meaning they "had the authority to take at least this minimal corrective measure, which, if effectively carried out, would impart knowledge of the harassment to higher School District officials with even greater authority to act").

Viewing the summary judgment facts here in the light most favorable to plaintiff, a reasonable jury could find that the teachers and coaches at Galena Middle School exercised control over their students or athletes. Likewise, a reasonable jury could find that they possessed the ability to control the context where the harassment occurred and institute corrective measures, particularly where the conduct occurred in their classroom or their practices fields. While teachers and coaches may not exercise the same degree of control or have the ability to impose the same corrective measures as a principal, assistant principal, or superintendent, a rational juror could find that reporting student-on-student harassment to a coach or teacher qualified as reporting it to an "appropriate person." Indeed, the school district's own policy calls for district employees to resolve incidents at the lowest level possible—and the level above students resolving differences themselves is at the teachers and coaches level. And, the Bullying Prevention Plan—which includes any sexual harassment in violation of the district's sexual harassment policy as bullying—permits students to report bullying to "any adult employee." Doc. 72-1 at 4.

As an example, a reasonable jury could find that the conduct in Diana Moss's classroom occurring within her earshot was within her "requisite control necessary to take corrective action to end the discrimination." *Murrell*, 186 F.3d at 1248. And, on the summary judgment version of the facts, some of the alleged harassment happened in this setting, with no responsive action taken by Diana Moss. G.P.'s actions took place in Ms. Moss's classroom within a place where

she could see his actions and hear his comments. And, despite this knowledge and despite other students observing G.P.'s treatment of J.M.S. and J.M.S. himself alerting Ms. Moss to the conduct, Diana Moss did nothing to stop the harassment. Ms. Moss did move J.M.S.'s desk closer to her desk. And, though she testified that she didn't hear the comments or see the head-hitting, a reasonable jury could find that Diana Moss was aware of the harassing conduct and didn't take necessary action to stop it. Plus, many of the incidents initially raised to teachers or coaches were reported to principals or assistant principals afterward. J.M.S. and S.E.S. discussed the history of issues J.M.S. had experienced during his seventh grade year—including those arising in Ms. Moss's class—with Assistant Principal Strickland, Principal VanCleave, and Superintendent Smith in January 2016. And, in addition to those January 2016 meetings, issues during golf and football practice also were reported to Assistant Principal Strickland or Principal Klaver close in time to when they had occurred.

Defendant cites a number of cases concluding that teachers are not appropriate employees to receive reports of Title IX discrimination. Doc. 72 at 48–49 n.5; Doc. 80 at 86. But, defendant's cases weren't decided by the Tenth Circuit, and all but one of them dealt with harassment of a student by a teacher—not student-on-student harassment. *See Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 456–58 (8th Cir. 2009) (where teacher harassed student, reporting conduct to guidance counselor and other teachers was not providing actual knowledge to an appropriate person because evidence did not support the conclusion that these persons had capacity to exercise control over the harassing teacher or institute corrective measures, *i.e.*, no evidence supported that they "had the power to stop or prevent the harassment from occurring by taking actions such as suspending [the teacher] from teaching, curtailing his teaching or other school-related privileges, requiring him to attend sessions or meetings about his behavior, or

ensuring that he was under greater supervision"); *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 169–73 (3d Cir. 2002) (explaining student allegations of sexual harassment against teacher must be reported to principal not guidance counselor and that "[h]olding a school district responsible for actions of a principal fixes responsibility at a sufficiently high level to afford the recipient of Title IX funds an opportunity to respond to claims of discrimination before funds are jeopardized by a teacher's conduct" and "affords an opportunity for voluntary compliance with the contractual undertakings that are part of Title IX funding"); *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 659–60 (5th Cir. 1997) ("Whether the school official is a superintendent or a substitute teacher, the relevant question is whether the official's actual knowledge of sexual abuse is functionally equivalent to the school district's actual knowledge. We hold that a school district can be liable for teacher-student sexual harassment under Title IX only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so.");[44] *Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, 341 F. Supp. 3d 793, 806 (S.D. Ohio 2018) ("To sustain a student-on-student harassment claim against a school, courts have required actual knowledge by the school board itself, the school superintendent, or a school principal." (citing cases that involve teacher-on-student harassment as well as student-on-student harassment)).  The standard adopted by the Tenth Circuit controls here and the court must follow it.  The court may not displace the Circuit's binding authority in favor of authority from other circuits applied in different contexts.  Thus, as *Murrell* explains, an "appropriate

---

[44]    Like in *Murrell*, the court in *Rosa H.* implies a teacher may be an "appropriate person."  The Fifth Circuit explained that the question is whether the school board "has appointed [that person] to monitor the conduct . . . and, as distinguished from reporting to others, remedy the wrongdoing themselves.  In *Rosa H.*, the bulk of employees— like other teachers, coaches, janitors—did not have requisite control and supervisory authority over a teacher accused of harassing a student.  *Rosa H.*, 106 F.3d at 660.  But, on the facts here, where student-on-student harassment is reported to a teacher or a coach, that teacher or coach may have the requisite control and ability to halt the abuse.

person" under Title IX means "a school official who has the authority to halt the known abuse," and this fact-based inquiry is not dependent on job title. 186 F.3d at 1247.

On the summary judgment record before the court, where S.E.S. or J.M.S. has reported the alleged harassment to a superintendent, principal, assistant principal, teacher, or coach, the court cannot conclude as a matter of law that plaintiff did not report the alleged harassment to an "appropriate person." *See Gebser*, 524 U.S. at 290–91. Defendant's second argument for summary judgment has not carried the burden imposed by binding authority from our Circuit.

### ii. Actual Knowledge of Harassment

*Third*, defendant argues that J.M.S. and S.E.S. did not provide defendant sufficiently detailed notice of the alleged sexual harassment—*i.e.*, the evidence cannot support a finding that defendant had actual knowledge of harassment based on sex. Defendant again concedes that sufficient information about *some* incidents was reported to an appropriate official to provide defendant actual knowledge, so summary judgment is not appropriate as a matter of law based on defendant's third argument. But, defendant argues that "other conduct about which [J.M.S.] now complains was either not reported at the time or [he] failed to identify the individuals engaging in the complained of conduct." Doc. 72 at 48. And so, defendant asserts, plaintiff's Title IX claim "must be limited to those events which [J.M.S.] actually reported to appropriate school officials by identifying what occurred and who engaged in the alleged harassing conduct."[45] *Id.* Defendant contends "any other incidents must be disregarded." Doc. 80 at 87.

To impose liability under Title IX for student-on-student harassment based on sex, the school district first must have received "actual knowledge" of the harassing conduct so that it has

___

[45] Defendant's brief included these arguments in its section titled "Notice of alleged sex harassment was not received by an appropriate official." *See* Doc. 72 at 48. But, the argument fits best as part of defendant's "Sufficiently detailed knowledge was not provided to a school official" section. *See* Doc. 72 at 49.

"an opportunity to take action to end the harassment or to limit further harassment." *Gebser*, 524 U.S. at 289–90.  Then, if an appropriate person has actual knowledge of the discrimination and fails to respond adequately, *i.e.*, remains deliberately indifferent to known acts of harassment, a Title IX plaintiff can hold the school district liable where he can prove the other elements of a student-on-student harassment claim.  *Davis*, 526 U.S. at 642, 648–50.  But, the school district's liability is limited to circumstances where it has substantial control over both the harasser and the environment where the harassment occurs, so that its deliberate indifference, in effect, causes its students to experience harassment or be more vulnerable to harassment.  *Id.* at 644–47.

Defendant argues the unreported or vaguely reported incidents of harassment "cannot form the basis of Plaintiff's Title IX claim."  Doc. 80 at 86.  Defendant contends that conduct J.M.S. or S.E.S. reported without sufficiently identifying the harassers and what they did cannot qualify as "actual notice."  And, to the extent "generic bullying or harassment" was reported, as opposed to "behaviors that were described or reported in sufficient detail to place the appropriate school official on notice that a claim of sex based harassment was being asserted," defendant argues those reports cannot serve as "actual notice."  Doc. 72 at 49.  Defendant characterizes the name-calling as nothing "more than terms of derision used by middle school aged students."  *Id.*

On the summary judgment record before the court, defendant cannot plausibly dispute its actual knowledge of the harassment J.M.S. alleges to have experienced.  Most incidents were reported to district employees—including principals, assistant principals, the superintendent, and other teachers and coaches.  Viewing the evidence and drawing reasonable inferences in the light most favorable to plaintiff, most of these reports included meaningful detail about the specific conduct and types of names students had used to harass J.M.S.  The reports also identified the alleged harassers by name.

At the very least, the wide-spread use of name-calling and other specific conduct was reported to Assistant Principal Strickland and Principal VanCleave at two meetings in January 2016. And, Superintendent Smith learned the same information during a second meeting later that month. After these meetings, future issues of similar name-calling during J.M.S.'s seventh grade year also were reported to Assistant Principal Strickland. And, the incident where D.O. rubbed his hands on J.M.S.'s face after placing them inside his pants was reported to teacher Diana Moss, Assistant Principal Strickland, and Superintendent Smith. Assistant Principal Strickland and Superintendent Smith emailed certain teachers telling them to look out for students bullying J.M.S. Superintendent Smith directed any teacher who heard name-calling such as "queer" or "fag" to send the student to the office. During eighth grade, Principal Klaver received reports about multiple episodes of harassment. A reasonable inference from the evidence is that the harassment during J.M.S.'s eighth grade year was a continuation of issues he had encountered during seventh grade and reported to teachers, coaches, and administrators. Some of these eighth grade incidents involved similar name-calling. As explained above, a jury must decide whether the name-calling and other alleged conduct constituted sex-based harassment and who would qualify as an appropriate person in the district to report such behavior to for it to qualify as the district's actual knowledge. But, on this summary judgment record, a reasonable jury could find defendant had actual knowledge of sex-based harassment occurring under circumstances where defendant had substantial control over both the harasser and the environment.

Still, to the extent the harassment was not reported to anyone employed by the district, the court agrees with the gravamen of defendant's argument. For those unreported episodes, plaintiff cannot hold the school district liable because, without actual knowledge and an

opportunity to take action, defendant cannot have manifested deliberate indifference to such harassment. *Gebser*, 524 U.S. at 289–90; *see also Davis*, 526 U.S. at 646–47 ("We thus conclude that recipients of federal funding may be liable for 'subjecting' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." (alteration omitted)).

For the first time in its Reply, defendant identifies the specific facts that, according to its view of the record, plaintiff cannot use to support the Title IX claim. But by waiting to provide this detailed information until its Reply, defendant has deprived plaintiff of the opportunity to respond to the specific facts challenged. In her Response, plaintiff argued generally that unreported incidents or incidents where individual harassers were not identified "may not necessarily be considered in conjunction with the issue of actual notice, but they occurred and certainly go to the issue of severity and pervasiveness." Doc. 75 at 132 n.24.

Because defendant relied on general arguments for summary judgment and waited to identify the specific facts challenged until its Reply, the court declines to declare definitively any of the identified facts as incapable of supporting plaintiff's claim. *See* Fed. R. Civ. P. 56(g) (permitting a court that "does not grant all the relief requested by" a summary judgment motion to "enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case"). But, hoping that it will sharpen the issues for trial, the court briefly outlines some of the facts that defendant contends were not adequately reported, below. Some facts may not have provided defendant actual knowledge of sex-based harassment, as required by Title IX. But for others, defendant has cherry picked the facts and attempted to

ignore that other facts and reasonable inferences from the facts establish these incidents ultimately were reported to defendant's employees.

For example, J.M.S. reporting to Tamara Ballantyne, Rayanna Lee, or Diana Moss that people were being mean to him, without more detail about how they were treating him, would not seem to provide defendant actual knowledge because the reports appear insufficient to alert these teachers to harassment based on sex. *See Gebser*, 524 U.S. at 28991 (explaining constructive notice is insufficient under Title IX and concluding that a complaint from parents of other students that the teacher had made inappropriate comments during class was "insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student" and thus failed to supply the actual notice required for a Title IX claim); *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119–20 (10th Cir. 2008) (concluding complaints that boys were "bothering" plaintiff "were insufficient to constitute actual notice of sexual harassment"). Nor would it seem that plaintiff can hold defendant liable for name calling that occurred over the summer, or the incident where G.P. commented that J.M.S. was "so fucking gay" on a social media post made after school hours. These incidents were not reported to anyone in the district and did not occur when defendant had control over the harasser or the context of the harassment. *Murrell*, 186 F.3d at 1246; *see also Theno*, 377 F. Supp. 2d at 957 n.3. So, it seems unlikely that a reasonable jury could find the school district had actual notice, or was deliberately indifferent to such harassment.

Defendant also cites the incident with K.I.'s ex-boyfriend, a student from another district. Again, because the defendant school district had no capacity to control the harasser, plaintiff cannot hold defendant liable for its response to the conduct. *Id.* But, this incident may still be relevant because it also involved H.P., a Galena school district student, commenting on the

posting during school hours. And, H.P. and J.M.S. later got into a fight and had to report to Principal Klaver's office to discuss the problem. So, a reasonable jury could find the district had actual knowledge of the alleged sex-based harassment by H.P.

One incident reported to Principal Klaver would seem unable to support a rational finding that the district received actual notice of sex-based harassment. This was the October 20, 2016 incident where J.M.S. called another girl cute, D.H. got involved, and J.M.S.'s girlfriend broke up with him as a result. It is not apparent whether this is one of the incidents that plaintiff asserts constituted sex-based harassment. S.E.S. testified that J.M.S.'s comment calling another girl cute was innocent, but the students used it "to stir up more harassment of him, just to get his girlfriend to break up with him." Doc. 72-8 at 18. J.M.S. did not expect the district to do anything about D.H.'s actions and he "just blew it off." Doc. 72-15 at 19. A reasonable juror could not find the details of this incident to have put Principal Klaver on notice that J.M.S. was being harassed based on his sex. Still, while no reasonable juror could find notifying Principal Klaver of this incident provided her notice of sex-based harassment, these facts may be relevant to the appropriateness of the district's response when J.M.S. had other issues with D.H. that are alleged to constitute sex-based harassment and were raised to the district's attention. J.M.S. had a number of other issues with D.H. including the "Locker Room" nickname, name-calling in Diana Moss's classroom, and an incident in physical education class. D.H. also was around during the Baxter Springs basketball game incident.

Defendant, citing several other facts, argues the court should disregard them as unreported or lacking in detail. But, defendant's arguments are unpersuasive. Viewing the evidence in the light most favorable to plaintiff, the summary judgment facts show these incidents actually were reported to defendant's employees with information about the incident

and harassers, so plaintiff can use these facts to support the actual knowledge element of plaintiff's Title IX claim.  While J.M.S. did not report the incident at the Baxter Springs basketball game *that night*, the next day, after a fight ensued, S.E.S. and J.M.S. met with Assistant Principal Strickland and Principal VanCleave where they discussed what had happened at the basketball game, along with the other issues J.M.S. had encountered that year.  Similarly, though J.M.S. does not recall the lunchroom incident where someone called him a "fag" and did not report it to any school officials in the lunchroom, he did report it to S.E.S. and, that same day, J.M.S. and his parents met with administrators and discussed all of the harassment throughout the year.  A reasonable inference from the timing of this meeting is that J.M.S. and his parents discussed the lunchroom incident with school officials even if J.M.S. cannot recall it now.  The February 4 basketball incident where G.F. told another student that J.M.S. was "the biggest fag in the world" was not reported *during the game*, but S.E.S. called Assistant Principal Strickland the next day.  Though S.E.S. reported that she'd spoken with G.F.'s family and resolved the issue, the district was given actual notice what had happened at a school event.  The same can be said of the group chat incident with R.M. where S.E.S. reported the incident to Principal Klaver after discussing it with R.M.'s family.  Defendant also cites the conflict in band class with K.M., but the details of the incident are not included in the summary judgment record and it is not clear whether plaintiff intends to include the incident as alleged Title IX harassment.  Either way, Principal Klaver was notified of this event.  And, defendant cites the incident at golf practice involving E.O. and his girlfriend.  But, S.E.S. again brought this to Coach Thompson and Principal Klaver's attention.

Finally, defendant points to the fact that J.M.S. testified there were other instances he was called names and he has little or no memory of them, and that he did not report all of these

episodes to the school. And, defendant cites Principal Klaver's testimony that J.M.S. did not report to her that anyone was bullying him. To the extent the name-calling was not reported to the school it cannot form the basis of plaintiff's claim because Title IX requires actual knowledge. But, a reasonable inference from the record is that defendant's employees, including Principal Klaver, were notified of the frequency other students subjected J.M.S. to name-calling and other conduct of a nature that a reasonable jury could find to be sex-based harassment. For instance, at the meetings with administrators in January 2016, S.E.S. and J.M.S. reported the history of issues J.M.S. had encountered at school that year. And, in eighth grade S.E.S. reported issues to Principal Klaver and Principal Klaver herself witnessed the lunchroom incident where J.M.S. screamed he was "not a fucking faggot."

Defendant argues it cannot "be held responsible for failing to punish harassment by unknown individuals," and suggests that it only can have actual knowledge if J.M.S. reported "who engaged in the alleged harassing conduct." Doc. 72 at 48. But, while Title IX requires *actual knowledge* of harassment occurring where the school has substantial control over the harasser and the environment, a reasonable jury could find J.M.S.'s reports describing conduct that could constitute sex-based harassment by other Galena students while at school or school sponsored events provided defendant with actual knowledge, even where he could not identify the specific name of the harasser or the date and exacting details of what occurred. The Supreme Court in *Davis* noted "that the identity of the harasser is [not] irrelevant" because "[d]eliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment . . . and authority to take remedial action." 526 U.S. at 644. When the harasser's name is known and provided to the school district, that may be a factor when determining the appropriateness of the school district's

response. But, where the harasser is identified more generally as a student in the victim's class or on the victim's school sports team, this still provides notice of harassment under circumstances where the harasser and the environment are under the school's control. And, the school would have authority to take remedial action to prevent future harassment, or at least make the victim less vulnerable to it.[46] *See id.* at 644–45. Also, as plaintiff argues, these reports to district employees where the individual harasser was not identified by name may help establish the severity and pervasiveness element of plaintiff's Title IX claim.

So, to the extent J.M.S. or S.E.S. reported harassing conduct, without giving specific harasser names, dates, and details beyond the description of the alleged sex-based harassment and general identity of the harasser as a fellow student, these reports still may be relevant to plaintiff's Title IX claim and the court does not disregard them categorically. A reasonable inference from the record is that these more general reports of alleged sex-based harassment were made giving defendant actual knowledge that on a widespread, frequent basis its students were harassing J.M.S. at school or during school events. Even where the specific harasser was not identified, a reasonable jury could find defendant had actual knowledge of harassment based on sex sufficient to merit a remedial response. These reports also could be relevant to the

---

[46] For example, if a student reported to a school official that every day when she was walking in the hallway between classes another student or students touched her inappropriately, but the victim did not see who the harassers were and could not identify them by name, Title IX doesn't permit the school to ignore the reported sexual harassment just because the harasser is unknown. A more reasoned approach would find that her report provided the school actual knowledge of sex-based harassment, *i.e.*, the identity of the harasser (beyond his or her identity as a student at the school) is not required to provide actual knowledge of the acts of harassment. In such a situation the school still received actual knowledge of harassment that occurred under circumstances where it exercised control over the environment and the harasser, albeit unknown. Depending on the circumstances, a reasonable response could require the school to position more teachers in the hallways between class to monitor student conduct, or to review school policies with the students about conduct not permitted and the punishment if a violation occurs, or to investigate to try to determine the identity of the harasser. *See Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 169 (1st Cir. 2007) (where school arranged for victim to observe students on school bus to see if she could identify the alleged perpetrator and then launched investigation). In any event, the school should not be exempt from liability under Title IX where it knows about sexual harassment within its school just because the particular harasser's name is unknown.

severity and pervasiveness of the harassment as well as whether defendant acted with deliberate indifference to known acts of harassment, *i.e.*, the appropriateness of the district's efforts to remedy the ongoing harassment both where J.M.S. reported the identity of the harasser and where J.M.S. provided actual notice without naming the harasser.

In sum, a rational trier of fact could find that defendant had actual knowledge of sex-based harassment, making summary judgment inappropriate on this basis. Although the few incidents of harassment that never were reported to anyone in the district cannot support this element of plaintiff's claim, the summary judgment record contains sufficient evidence of reports that J.M.S. or his parents made to the district to create a triable issue whether the district had actual knowledge of sex-based harassment.[47]

### iii. Deliberate Indifference

*Last,* defendant argues that the uncontroverted facts cannot support a finding that the district acted with deliberate indifference. Defendant contends plaintiff has not adduced evidence sufficient to support a finding that its response to the known acts of harassment was clearly unreasonable in light of the circumstances. So, defendant asserts, plaintiff cannot show deliberate indifference and the court should grant summary judgment against plaintiff's Title IX claim.

The deliberate indifference standard "does not mean that [school districts] can avoid liability only by purging their schools of actionable peer harassment or that administrators must

---

[47]     Plaintiff also cites the Student Climate Survey results as providing defendant notice that the school had a culture of gender-based bullying and harassment. Doc. 75 at 135. But, no reasonable juror could find these survey results amount to *actual* knowledge of sex-based harassment because they included only general statistics on bullying, without giving any detail about the type of bullying conduct that is occurring. *See Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1153–54 (10th Cir. 2006) (explaining "harassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX" but the school still must be provided "with actual knowledge of sexual harassment in its programs" similar to that alleged by the plaintiff such that the school can be said to have "actual knowledge of a *substantial risk* of abuse to students based on prior complaints by other students" (internal quotations and citation omitted)).

engage in particular disciplinary action." *Davis*, 526 U.S. at 648. Nor do victims have a "right to make particular remedial demands." *Id.* Courts must "refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* And, courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Id.* at 651. Only when the school district's response (or lack of response) to the harassment "is clearly unreasonable in light of the known circumstances" do federal funding recipients reach the deliberate indifference level. *Id.* at 648–49. And, "deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645 (internal quotation marks, citations, and alterations omitted). "The premise" of the deliberate indifference standard is to hold school districts liable only where there "is an official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290. Indeed, the Supreme Court has made it clear: "In an appropriate case, . . . on a motion . . . for summary judgment" a court could "identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Here, defendant argues that it did not respond to plaintiff's complaints of harassment in a deliberately indifferent manner. While it may not have disciplined the alleged harassers in the manner desired by plaintiff or eliminated the harassing conduct entirely, the district contends it addressed and resolved "each reported incident of harassment (whether it could be considered sex harassment or not)." Doc. 72 at 51. Defendant asserts it was unaware that its remedial action was ineffective because, after each reported incident, it thought the harassment was resolved. *Id.* at 52. In defendant's view, it can be found deliberately indifferent only if it took no action and made no effort whatsoever to end the harassment. *Id.* at 50.

Plaintiff, in contrast, argues defendant was deliberately indifferent for two reasons. First, plaintiff contends defendant was deliberately indifferent because it continued to respond to allegations of sex-based harassment with verbal admonishments to the student-harassers, even after it knew this remedial measure had proved ineffective. Doc. 75 at 135–36. Second, plaintiff argues that defendant did not follow its own written policies and procedures to prevent and address bullying, including sexual harassment, like forming a stand-alone bullying committee, collecting data, and reporting on bullying to the Board of Education. Plaintiff contends these failures show deliberate indifference where J.M.S. provided defendant actual notice of repeated harassment, and defendant did not modify its policies or practices (or follow them as written). *Id.*[48]

---

[48]     Because the court concludes a genuine dispute remains whether defendant was deliberately indifferent in its responses to the alleged sex-based harassment, the court need not reach plaintiff's second argument why defendant was deliberately indifferent—*i.e.*, that its compliance with its own policies on bullying was lacking. Plaintiff spends a portion of its brief arguing that a failure to follow strictly defendant's policies and procedures on sexual harassment and other bullying amounts to deliberate indifference. *See* Doc. 75 at 138–140. Defendant argues a failure to abide by anti-bullying policies cannot "establish deliberate indifference to specific known acts of sex harassment." Doc. 80 at 90–91.

The failure to follow established policies and procedures may be relevant to the adequacy of defendant's response to known acts of harassment. *See Davis*, 526 U.S. at 635, 654 (explaining complaint alleged school board was deliberately indifferent because it made no effort to investigate or put an end to harassment, where complaint alleged school had not instructed its personnel how to respond to sexual harassment and had not established a policy on the issue, did not discipline the harasser, and did not separate the victim from the harasser). But, such failures alone cannot constitute discrimination or establish actual knowledge and deliberate indifference. *See Gebser*, 524 U.S. at 291–92 (failure of school to establish and publicize a policy and grievance procedure for sexual harassment claims as required by Department of Education regulations under Title IX does not itself constitute discrimination and "does not establish the requisite actual notice and deliberate indifference;" the implied private right of action under Title IX does not "allow[] recovery in damages for violation of those sorts of administrative requirements"); *see also C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1340 (D. Kan. 2008) (explaining that "the failure to implement sexual harassment policies and procedures is insufficient to establish liability under Title IX because this failure does not imply the school district's actual notice of any sexual harassment or its deliberate indifference thereto").

In *Sanches v. Carrollton-Farmers Branch Independent School District*, the plaintiff argued the school's response to her sexual harassment claim was clearly unreasonable, in part, because the school did not follow the district's procedures for reporting sexual harassment. 647 F.3d 156, 168–70 (5th Cir. 2011). The Fifth Circuit declined to conclude the school's response was clearly unreasonable because it failed to follow its own procedures, which directed the principal to contact the district's Title IX coordinator or the superintendent immediately following any allegation of harassment. *Id.* at 169–70. A failure to comply with administrative regulations does not establish the required deliberate indifference, but instead sounds in negligence. *Id.* And, Title IX "does not require flawless investigations or perfect solutions." *Id.* at 170. Even if the principal had notified the Title IX coordinator

The summary judgment record here does not preclude, as a matter of law, a finding of deliberate indifference. Defendant was not required to eliminate all harassment or discipline the harassers in a particular fashion. *Davis*, 526 U.S. at 648; *see also Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 168–70 (5th Cir. 2011) (explaining even if school's actions had failed to remedy the harassment, "[i]neffective responses . . . are not necessarily clearly unreasonable" and holding that, where school took statements after each reported event but the investigation led to conflicting reports, spoke to the alleged harasser about her conduct, and removed the harasser from one of the victim's classes and from cheerleading tryouts, as a matter of law the school's response was not deliberately indifferent, particularly where the alleged harasser had quit the cheerleading team and the victim and alleged harasser were no longer interacting); *Sauls v. Pierce Cty. Sch. Dist.*, 399 F.3d 1279, 1285 (11th Cir. 2005) ("[A] school district is not deliberately indifferent simply because the measures it takes are ultimately ineffective in stopping a teacher from harassing the plaintiffs."). But, "'where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail,'" a reasonable jury could find that the school district "'has failed to act reasonably in light of the known circumstances.'" *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009) (quoting *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000)) (emphasis omitted). The requirement to show the school district's response was clearly unreasonable in light of the known circumstances is a high bar, but it does not mean a school can avoid liability simply by taking minimal action and making minimal effort, as

---

or the superintendent about the conduct as the policy mandated, they then would have directed her to do what she already had done, which also was in accordance with district policy. Namely, the policy directed the principal to determine if the allegations could constitute sexual harassment, and if so, conduct an investigation. *Id.* Deliberate indifference turns on the school's actual response to the known acts of harassment. It does not depend on how effectively it followed its policies and procedures.

defendant suggests here.  *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1155–56 (10th Cir. 2006) (explaining a minimalist response does not equate to a reasonable response, but concluding that the defendant's response was not minimal—or deliberately indifferent—where defendant allowed the plaintiff to transfer out of the teacher's class, terminated the school's relationship with the teacher at the end of the semester, and plaintiff did not allege any further sexual harassment occurred because, while defendant "might have taken more aggressive action," its response was not clearly unreasonable in light of the known circumstances); *see also Vance*, 231 F.3d at 260–61 ("[A] minimalist response is not within the contemplation of a reasonable response.  Although no particular response is required, and although the school district is not required to eradicate all sexual harassment, the school district must respond and must do so reasonably in light of the known circumstances.").

In *Patterson v. Hudson Area Schools*, the district court had granted summary judgment for the school district, concluding the district was not deliberately indifferent as a matter of law because each time the victim or his family "reported an incident and [the school district] knew who the perpetrators were, [the school district] reprimanded or punished those individuals, who later did not bother [the victim]."[49]  551 F.3d at 444.  The Sixth Circuit reversed the district court's summary judgment order, holding that a genuine issue of material fact remained whether the school district's actions were deliberately indifferent.  *Id.* at 445–46.  It explained, "even though a school district takes some action in response to known harassment, if further harassment continues, a jury is not precluded by law from finding that the school district's

---

[49]     The alleged harassment in *Patterson* included ongoing name calling like "faggot," "gay," and "queer" and a nickname "Mr. Clean"—"a derogatory term that referred to [the victim's] supposed lack of pubic hair."  551 F.3d at 440.  He also frequently was pushed in the hallways, teased for being slapped by a girl, and had his locker and planner vandalized with sexually oriented phrases, among other incidents.  *Id.* at 440–43.  The harassing conduct began in sixth grade and worsened over time, ending in ninth grade when the victim was sexually assaulted by a baseball teammate, leaving the victim psychologically unable to return to the school.  *Id.* at 443.

response was clearly unreasonable." *Id.* at 448.  Once a school district "knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student" a reasonable jury could find the school district liable under Title IX if it does not take additional action in light of the circumstances. *Id.*; *see also Theno*, 377 F. Supp. 2d at 965–66 ("[A] rational trier of fact could find that the school's response to the known harassment was clearly unreasonable because this is not a case that involved a few discrete incidents of harassment.  It involved severe and pervasive harassment that lasted for years, with other students engaging in the same form of harassment after those who were counseled had stopped, and the school rarely took any disciplinary measures above and beyond merely talking to or warning the harassers."); *cf. Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) ("If the institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment.  Of course, if it learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability.").

The Sixth Circuit cited the *Theno* decision from our court with approval.  *Patterson*, 551 F.3d at 447–48.  In both cases, the victim was repeatedly harassed over a number of years and the school responded largely with verbal reprimands to the harassers.  *Id.* at 448.  These reprimands "largely stopped harassment by the reprimanded student" but "they did not stop other students from harassing" the victim.  *Id.*  And, because the school's "success with individual students did not prevent the overall and continuing harassment of [the victim], a fact of which [the defendant] was fully aware," the court concluded defendant could not be shielded "from liability as a matter of law." *Id.* at 448–50.  So, the Sixth Circuit remanded the case so a jury

would decide if the school's actions were clearly unreasonable in light of the known circumstances. *Id.*

Likewise here, the summary judgment record reflects school employees often responded to the reports of harassment by speaking with J.M.S. and his parents and, sometimes, with verbal reprimands issued to or counseling sessions convened with the harassing students. Only where physical contact was involved were any students suspended. But, the evidence demonstrates repeated harassment over two years. And, as explained below, a reasonable inference from the evidence is that the school district knew the verbal counseling did not stop the widespread harassment, or even harassment by some of the same students. *See Theno*, 377 F. Supp. 2d at 976–77 (explaining the court must consider whether preventive action taken by defendant was reasonably calculated to end the harassment both by the disciplined perpetrator and to deter future harassers and, while an initial response may have been reasonable, the same response to repeat conduct may not be reasonable). Indeed, the record before the court shows some of the same students initially counseled by coaches or administrators continued to harass J.M.S. And, even when a particular student's harassing conduct ceased, other students would engage in similar name-calling and other harassing conduct. On these facts, "a reasonable jury certainly could conclude that at some point during the [two]-year period of harassment the school district's standard and ineffective response to the known harassment became clearly unreasonable." *Id.* at 966.

Defendant asserts it was unaware that its remedial action was ineffective, because after each reported incident it thought the harassment was resolved. The district says it met with students and parents after incidents were reported and imposed discipline "up to and including suspensions" so, as a matter of law, plaintiff cannot demonstrate it was deliberately indifferent.

Doc. 72 at 52. But, the record is far less clear about whether defendant adequately responded and took remedial measures for each reported incident of harassment. To be sure, periods would pass without J.M.S. or S.E.S. reporting harassing conduct to district employees. And, some incidents went unreported. Sometimes, S.E.S. would report harassing behavior to defendant's employees, but note that the issue already had been dealt with externally. Still, viewing the evidence in the light most favorable to plaintiff, defendant's employees received multiple reports of harassment over the course of J.M.S.'s seventh and eighth grade years. And, it is difficult to tell from the summary judgment record the level of investigation defendant conducted after each reported incident and which remedial measures it took. For some incidents, the record does not show whether defendant met with the alleged harasser who J.M.S. identified, or what efforts (if any) were taken to separate the harasser and J.M.S. or to institute other disciplinary or remedial measures beyond a counseling meeting with the students about the incident. Unless a physical fight or inappropriate touching was involved, defendant's response, it appears, generally remained the same—talk to J.M.S. or S.E.S. about the issue and, sometimes, talk to the other students. A reasonable inference from the summary judgment record is that this method of response continued even after defendant knew it wasn't curbing the harassing conduct.

J.M.S. alleges the harassment began during football season in the fall of 2015. S.E.S. reported the incident with E.D. bouncing a football off J.M.S.'s head to Coach Ryan and Athletic Director Beau Sarwinski. That same season both J.M.S. and S.E.S. reported the "Locker Room" nickname to Coach Ryan. J.M.S. was told the nickname was started by J.O. or E.D. A.S. had started the rumor J.M.S. was gay. A number of students were using the "Locker Room" nickname—including A.S., D.H., K.C., J.O., E.D., and possibly E.O.—and a reasonable inference is that S.E.S. or J.M.S. identified at least some of these students to Coach Ryan. Coach

Ryan told S.E.S. he would take care of it. Assistant Principal Strickland also was notified of an issue with football, and remembers Coach Ryan and he spoke with E.D., J.O., E.O, and A.S. He believed the issue was resolved after speaking to these students. The record reflects no additional remedial measures or disciplinary action against these students beyond the verbal conferences. Except, in October, Coach Ryan also talked to the football team about treating each other like family and made E.D. run as a punishment for the incident where he hit J.M.S. in the head with a football.

S.E.S. also talked to Coach Ryan about issues with D.H., S.N., and E.D. in Diana Moss's classroom. Coach Ryan met with the three students and gave them a verbal warning to be careful about their comments because what they think is a joke may offend others. Both the "Locker Room" nickname and these incidents in Diana Moss's class involved D.H. and E.D. and the summary judgment record includes only verbal warnings by defendant without any other punishment or corrective measure involved for either incident.

The name-calling continued into basketball season, and a reasonable inference from the facts in the record is that some of the same students continued the harassment despite the conversations with Assistant Principal Strickland and Coach Ryan. Though Assistant Principal Strickland believed the name-calling incidents were resolved in the fall, in January 2016, he learned that was not so. J.O. and E.O.—both boys he had previously spoken to about harassing conduct—were involved in the Baxter Springs basketball game incident and events that followed it. J.M.S. and S.E.S. met with Assistant Principal Strickland and Principal VanCleave after this incident and described all the issues J.M.S. had encountered so far during that school year. J.M.S. was suspended for his actions in trying to fight E.O. and choking K.W. But, the record

does not include any evidence of actions taken against E.O. or J.O.  K.W. returned to basketball practice laughing about how he was not being punished while J.M.S. got suspended.

Just days later, on January 11, Assistant Principal Strickland, Principal VanCleave, and Superintendent Smith met with J.M.S. and his parents after J.M.S. was called a "fag" at lunch. Again, J.M.S. and S.E.S. relayed the various harassing conduct, including issues in Diana Moss's classroom and the everyday name-calling that continued.  They instituted a plan where J.M.S. could report issues to Assistant Principal Strickland and all further issues should also be reported to Superintendent Smith.  Superintendent Smith thinks he had Principal VanCleave and Assistant Principal Strickland investigate the issues discussed at this meeting further and he received a verbal report.  But the record evidence does not provide the results of those investigations or establish what actions, if any, defendant took against the harassers who were identified at these January meetings or if defendant took any other remedial measures to prevent future harassment, or at least make J.M.S. less vulnerable to daily harassment.

Assistant Principal Strickland then was informed of an issue with G.F. after the February 4, 2016 basketball game.  S.E.S. told him the matter had been resolved without the school's assistance.  A few days later, Assistant Principal Strickland and Superintendent Smith emailed J.M.S.'s teachers asking them to keep an eye out for bullying behavior and derogatory name-calling towards J.M.S.  This email did not identify any particular students to watch when around J.M.S., nor were any coaches included on the email.

In April 2016, M. called J.M.S. a "fag" on the bus.  M. and J.M.S. also got into a physical altercation.  Both Coach Thompson and Assistant Principal Strickland were informed of this incident.  Assistant Principal Strickland told them name-calling was not worth getting suspended over but they could be suspended for the pushing and shoving.  The boys agreed they did not

want any suspensions.  Again, it appears the only remedial action was a verbal discussion with Assistant Principal Strickland.

G.P. also called J.M.S. derogatory names and engaged in other harassing conduct in Diana Moss's class.  Besides moving J.M.S.'s desk closer to hers, the record does not contain any evidence that Diana Moss took any action to stop the harassment or discipline G.P., even after J.M.S. reported G.P.'s actions to her and asked her to tell the principal.  As discussed above, a reasonable jury could find that the conduct taking place in Diana Moss's classroom occurred within her control and she had the ability to take corrective action to remedy the harassment.

One seventh grade incident did result in a suspension—when D.O. stuck his hands down his pants then rubbed them on J.M.S.'s face.  Diana Moss, Assistant Principal Strickland, and Superintendent Smith learned about this incident.  J.M.S. testified D.O. also engaged in name-calling.

The administration at J.M.S.'s school changed between seventh and eighth grade.  The summary judgment record does not establish whether Principal Klaver received any information about J.M.S.'s history from Principal VanCleave or Assistant Principal Strickland.  Nor is there any evidence that J.M.S.'s eighth grade teachers were notified to watch for harassing conduct.

In eighth grade, J.M.S. continued to have issues with D.H.—one of the boys that called him "Locker Room" and was talked to by Coach Ryan after name-calling in Diana Moss's class.  J.M.S. believes Mr. Dawes witnessed the incident where D.H. pushed J.M.S. into a girl during physical education class causing him to accidently touch her backside.

Principal Klaver was informed about N.G. calling J.M.S. a "fuck boy" and "gay" in late November of 2016.  She also was notified of the incident with R.M. calling J.M.S. "gay" in a

group chat. And, Principal Klaver witnessed the lunchroom incident that was instigated by A.S.—the student who, a year earlier, had started the rumor J.M.S. was gay and had called him "Locker Room." The record does not reflect whether Principal Klaver met with N.G., R.M., or A.S. about these incidents or if defendant took any disciplinary action, though S.E.S. had told her the incident with R.M. was handled outside of school already.

In March 2017, J.M.S. had another incident with E.O. (one of the students using "Locker Room" the previous year and one of the students involved in the Baxter Springs basketball incident) and his girlfriend that started at golf practice. Coach Thompson and Principal Klaver were informed about this issue. And Principal Klaver spoke to J.M.S., E.O., and S.G. the next day. Principal Klaver told S.E.S. and K.D.S. she could not discuss the discipline of other students with them, and the record does not contain evidence of what, if any, discipline was taken against E.O. and S.G. other than this conference.

That same month, H.P. called J.M.S. a "bitch" on social media. Principal Klaver learned of this incident and told S.E.S. she could investigate. But, the boys had already gotten into a fight. Both boys were suspended. Principal Klaver also told H.P. not to say things on social media he wouldn't say to the person's face.

On these extensive facts, a reasonable jury could find defendant's response to known harassment was clearly unreasonable in light of the known circumstances. The school district took some action in response to harassment. But, more harassment continued and in a manner where a reasonable jury could find the school district knew that its earlier responses were ineffective to deter the persistent harassment of J.M.S., requiring the school district to do more in light of the circumstances. *Patterson*, 551 F.3d at 448. The summary judgment facts here do not

preclude, as a matter of law, a finding of deliberate indifference. In short, defendant has failed to carry the burden imposed by binding case authority.

## VI.    Conclusion

For reasons explained above, the court denies defendant's Motion for Summary Judgment (Doc. 71) against plaintiff's Title IX claim. The court concludes genuine disputes over material facts remain, *i.e.*, whether J.M.S. was harassed because of his sex and whether defendant acted with deliberate indifference to known acts of harassment. The court also denies defendant's Motion to Strike Certain Declarations (Doc. 78).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Galena Unified School District No. 499's Motion for Summary Judgment (Doc. 71) is denied.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Strike Certain Declarations Submitted in Connection with Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 78) is denied.

**IT IS SO ORDERED.**

**Dated this 11th day of March, 2020, at Kansas City, Kansas**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
